2019 UT App 23

# THE UTAH COURT OF APPEALS

SHANE NEBEKER,
Appellant,
*v.*
TRISHA ANN ORTON,
Appellee.

Opinion
No. 20170438-CA
Filed February 14, 2019

Sixth District Court, Richfield Department
The Honorable Marvin D. Bagley
No. 154600140

Jared L. Peterson, Attorney for Appellant

Benjamin Kearns, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES KATE APPLEBY and JILL M. POHLMAN concurred.

MORTENSEN, Judge:

¶1      Shane Nebeker (Father) and Trisha Ann Orton's (Mother) extramarital relationship resulted in the birth of a son (Child). For the first eighteen months of Child's life, Father saw him only a few times. Then, concerned about Mother's illegal activities, Father took Child away from Mother without her consent. Sometime thereafter, Father and Mother worked out an extrajudicial, temporary custody arrangement that they perpetuated until a custody trial. After a bench trial, Mother was awarded primary physical custody of Child, and Father was awarded statutory minimum parent-time. Father appeals. We affirm in part—affirming the district court's decision regarding primary custody—and reverse in part—reversing the district court's decision related to Father's parent-time.

## BACKGROUND[1]

¶2    Father and Mother are parents of Child, born in December 2013. Mother and Father ended their relationship before Child was born, and they lived about 100 miles apart. During the first eighteen months of Child's life, Father saw Child on two occasions shortly after his birth. Mother stated that Father "was more than welcome to come down any time he wanted to" visit Child, but Father repeatedly told Mother, "I refuse to have anything to do with you to see my child." Mother did not allow Father to remove Child from her supervision because (1) Child was nursing and (2) Mother felt Child needed "to get to know" Father before he took him for a visit. Father admitted Mother told him he could visit Child at her residence, but Father said it would have been "uncomfortable" because there were "still feelings."[2]

¶3    Father did not provide financial support to Child or Mother during the first eighteen months of Child's life. The Office of Recovery Services opened a case, and the matter came before the district court in early May 2015, where Father's support obligation was determined.

¶4    In late May 2015, Mother allowed Father to visit Child. Mother's daughter (Daughter) picked up Child and took him to

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the [district] court's findings, and therefore recite the facts consistent with that standard." *Lake Philgas Service v. Valley Bank & Trust Co.*, 845 P.2d 951, 953 n.1 (Utah Ct. App. 1993).

2. Shortly after Child was born, Father reunited with his ex-wife. They had married for the first time in 2006, separated, divorced, and then remarried in June 2016.

meet Father at a nearby restaurant. Daughter allowed Father to take Child for a few minutes to buy a toy. But Father then sent Daughter a text message informing her that he was not returning Child. Father characterized this action as "rescuing" Child from the dangerous situation created by Mother's drug use. Father took Child to his house. Mother stated that the day Father took Child was the "darkest day of [her] life" and admitted that she "wasn't probably in the best place in [her] life." For the first week after Father took Child, Father allowed Mother to call and read Child a bedtime story, but after that week Father refused to answer the phone, and Mother "was not allowed to see [Child] for six months." Mother did not report Father's taking of Child to the police or any other authority.

¶5     Mother realized that she was "never going to get [her] baby back" unless she "got clean." She testified that she "found a new way of life" in a treatment center and "never touched [drugs] again."

¶6     In October 2015, Father filed a parentage petition in which he sought sole custody of Child and child support from Mother. Around January 2016, Mother and Father "agreed" to an ongoing extrajudicial temporary custody arrangement under which Child stayed ten out of every twenty-eight days with Mother and the balance of the days with Father.[3] Mother said that she felt "bullied" into accepting the temporary arrangement. Father stated that Child did well under the arrangement.

¶7     Ultimately, a two-day bench trial was held in October and November 2016. The district court made the following findings

---

3. The temporary arrangement began about ten months prior to the November 2016 trial. A temporary order allowing Mother parent-time was in place from late December 2015 through early January 2016.

of fact: (1) Mother and Father began a relationship when they were teenagers; (2) each had been married or in relationships with other persons; (3) each had other children from prior marriages or relationships; (4) each had a history of using illegal drugs and violating the law; (5) Father was married and Mother was single at the time of trial; (6) Child had his own bed and bedroom in Father's house; (7) Child had his own bed in Mother's room at Mother's house; (8) Father and Mother resided approximately 105 miles apart and had no plans to move closer to each other; (9) Mother had a good support system where she lived and believed she could avoid adverse influences she might encounter elsewhere; (10) Mother and Father each had family members to provide support and a positive influence on Child; (11) Father's employment required him to be away from home for fourteen hours per day during scheduled work periods; (12) Mother worked six-and-one-half hours daily, Monday through Thursday; (13) Child had been residing with both parents pursuant to an informal, temporary parent-time schedule; (14) Child was well-adjusted and doing well under the informal agreement. The district court also found:

> Both parties acknowledged past deficiencies in their parenting abilities. In essence both parties have had periods in their [lives] when they have been less than fit parents. However, at the present time both parties contribute financially to the welfare of [Child]; and both parties spend appropriate time with, and provide appropriate emotional support to [Child]. Essentially, both parents are fit parents. Both are very bonded with [Child].

¶8    In its analysis, the district court acknowledged that both parties had a history of drug problems, criminal activities, and extramarital sexual relations. "While Father cleaned his life up sooner than Mother, there is insufficient evidence for [the district

court] to make a decision as to whether one of the parties' past conduct was better or worse than the other." Indeed, Father admitted having a history of criminal activity, including "a couple DUIs," methamphetamine and marijuana use with Mother, and being incarcerated more than three times. Mother likewise admitted that she had a history of drug use and selling drugs, but she had been "over a year clean" at the time of the trial. Thus, the district court determined that "evidence relating to past conduct and moral standards is equally balanced between the parties."

¶9   In determining which parent should have primary physical care of Child, the district court highlighted four factors. First, in analyzing which party was most likely to allow "frequent and continuing contact with the other parent," the district court noted that the facts did not weigh in Father's favor, particularly because Father "surreptitiously" and "underhandedly" took Child and did not allow Mother to contact Child for a significant period. At the same time, the court acknowledged that taking Child motivated Mother's recovery from drug use. The district court found the evidence supported the conclusion that Child was "doing very well" in the care of both parents and that both parties were cooperating in providing the other "meaningful parent time."

¶10   Second, the district court determined that Child had a greater bond with Mother:

> While [Child] has recently spent considerable periods of time with Father, [Child] has overall lived more with Mother than Father. Prior to the time Father became concerned enough with Mother's drug use that he took self-help action, Father was content to allow [Child] to live primarily with Mother. The [district court] considers such action (or non-action) on the part of

Father to be a tacit acknowledgement that the best interests of [Child] were being best served by [Child] living primarily with Mother.

Thus, the district court determined that Mother had been the primary caregiver for Child.

¶11 Third, "Mother's work schedule is also more conducive to her having primary physical care of [Child]." The court reasoned that Mother could "devote more time to [Child's] needs than Father" because she "works fewer hours, travels less time to and from work, and has a more consistent work schedule than Father."

¶12 Fourth, the court cited the distance separating the parties as a motivating factor in its determination. "If the parties were living in the same community, or within a reasonably close distance from each other, the [district court] would likely have found a joint physical custody arrangement to be in [Child's] best interests." Indeed, both parties acknowledged at trial that once Child begins school, one parent must necessarily have primary custody. As Father noted, "Obviously when school starts, I think that's why we're here today. . . . I don't think we could possibly do a two week on or a one week on schedule when he's going to school."

¶13 Having weighed these factors, the court determined that it was in Child's best interests to award the parties joint legal custody, with Mother having primary physical custody. The district court further specified that "Father be allowed to exercise liberal and meaningful parent time with [Child]. At a *minimum* Father should be entitled to the *aggregate amount* of parent time provided by Utah Code Ann. § 30-3-35; with adjustments being made to that schedule to ensure Father's parent time is exercised, as much as is reasonably possible, at times Father is off work." Father appeals.

ISSUES AND STANDARDS OF REVIEW

¶14 The first issue is whether the district court's factual findings were properly supported by the evidence. "A challenge to the sufficiency of the evidence concerns the [district] court's findings of fact. Those findings will not be disturbed unless they are clearly erroneous." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (cleaned up). And a "court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Id.* (cleaned up).

¶15 The second issue is whether the district court erred when it departed from the informal custody arrangement and awarded primary physical custody to Mother and only the statutory minimum parent-time to Father. "We review custody determinations under an abuse of discretion standard, giving the district court broad discretion to make custody awards." *K.P.S. v. E.J.P.*, 2018 UT App 5, ¶ 24, 414 P.3d 933 (cleaned up). We will not disturb the district court's judgment "unless we determine the [district] court has exceeded the scope of permitted discretion or has acted contrary to law." *Davis v. Davis*, 2001 UT App 225, ¶ 6, 29 P.3d 676 (cleaned up). Further, "[i]t has long been the law in this state that conclusions of law must be predicated upon and find support in the findings of fact and that the judgment or decree must follow the conclusions of law." *Gillmor v. Wright*, 850 P.2d 431, 436 (Utah 1993).

ANALYSIS

I. The Evidence Supported the District Court's Factual Findings

¶16 Father's first argument is that the evidence does not support the court's factual findings. The factual findings of the district court "will not be disturbed unless they are clearly

erroneous" by being "in conflict with the clear weight of the evidence." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (cleaned up). But "the existence of conflicting evidence is not sufficient to set aside a [district] court's finding." *Bond v. Bond*, 2018 UT App 38, ¶ 6, 420 P.3d 53 (cleaned up). Rather, "to successfully challenge a [district] court's factual finding on appeal, the appellant must overcome the healthy dose of deference owed to factual findings by identifying and dealing with the supportive evidence and demonstrating the legal problem in that evidence, generally through marshaling the evidence." *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (cleaned up). "The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a 'fatal flaw'—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Kimball*, 2009 UT App 233, ¶ 20 n.5. Thus, "a party challenging a factual finding or sufficiency of the evidence to support a verdict will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal." *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645.

¶17   Here, Father has not addressed many of the district "court's findings and makes no attempt to marshal the evidence in support of them. He clearly views the evidence as compelling a different outcome, but it is not within our purview to engage in a reweighing of the evidence, and [Father] has not demonstrated that the evidence underlying the [district] court's findings is insufficient." *See Shuman v. Shuman*, 2017 UT App 192, ¶ 9, 406 P.3d 258 (cleaned up). We illustrate a portion of the absence of marshaling as follows.

A.     Child's Best Interests

¶18   Father disagrees that Mother is more likely than he is to act in Child's best interests. The court found that Father "underhandedly" and "surreptitiously" took Child and "kept

Child from Mother for some time." Father responded that he allowed phone contact between Mother and Child, and noted that Mother never filed a police report against him after he took Child, implying that she tacitly supported Father's decision to take Child. But Father fails to address why Mother would have been reluctant to call police. Mother had warrants out for her arrest. If she had filed a report, she likely would have lost custody of Child because she would have been arrested. By taking Child and withholding him from Mother, Father placed Mother in a no-win situation.

¶19 In contrast to Father's actions, the record indicates that Mother was willing to let Father visit Child. Shortly after Child was born and before paternity had been established, Mother allowed Father to visit Child. Father admitted that Mother told him he could come visit Child at her parents' house, but Father declined because there were "still feelings" and he was "uncomfortable" with such an arrangement. After paternity was established and Father agreed to pay child support, Mother allowed him to spend time with Child at a restaurant—a decision that led to her losing physical possession of Child. Furthermore, unlike Father, Mother never attempted to regain exclusive possession of Child through surreptitious means.

¶20 The district court also found that Father's "non-action" in allowing Child to remain with Mother for the first eighteen months of his life was a "tacit acknowledgment" that Child's best interests were served by remaining primarily with Mother. The court also noted that, although there was some dispute in the evidence at trial, Father told Mother shortly after taking Child that this arrangement was temporary and "she would get [Child] back after she cleaned up her drug use."

¶21 From this evidence the court concluded that "the parties have recognized it is in the best interest of [Child] that [Mother]

continue" to be his primary caregiver. As we noted in *Shuman*, Father "views the evidence as compelling a different outcome"—that his efforts to gain custody of Child demonstrate he was not content with allowing Child to live primarily with Mother—"but it is not within our purview to engage in a reweighing of the evidence." 2017 UT App 192, ¶ 9 (cleaned up). Thus, the district court's determination that Child's best interests were served by awarding Mother primary custody was sufficiently supported by the evidence and was not clearly erroneous.[4]

B.      Primary Caretaker Assessment

¶22     Father next argues that the district court's finding that Mother was the primary caretaker for the majority of Child's life is "contrary to the law and evidence." But Child lived *exclusively* with Mother for the first eighteen months of his life. In contrast, the parties *shared* custody from January 2016 until trial in late 2016. Father had sole custody for only about seven months—from May 2015 when he took child until January 2016 when the parties agreed to a temporary custody arrangement.

---

4. The court concluded that Mother would be more likely than Father to allow contact because Father resorted to self-help to take possession of Child and then kept Child from Mother for some time. Father did not deny taking and keeping Child. But he asserted Mother stopped calling Child and never filed a police report. Father further argued that the district court ignored (1) Mother withholding Child from Father prior to the self-help incident and (2) Father's willingness to allow additional contact under the informal custody arrangement. Although Father presented evidence that would have supported a contrary finding, we will not disturb the district court's finding that Mother was more likely to allow frequent and continuing contact for the simple reason that this finding was also supported by the evidence.

¶23 Father responds that "[i]t is not who the child has lived with the majority of his life, but who the child has lived with once a party initiates legal action." Father cites *Davis v. Davis*, 749 P.2d 647 (Utah 1988), in support of this proposition. We find Father's reading of *Davis* selective and inaccurate. In *Davis*, the parties in a divorce proceeding agreed that the father would have custody of a minor child so the child could stay in the family home. *Id.* at 648. About one month later, the divorce decree was set aside on the grounds that the mother was emotionally unstable at the time of the original proceeding and did not realize the consequences of her actions. *Id.* In the renewed divorce proceedings, the court awarded custody of the child to the father. *Id.* Our supreme court upheld the decision, noting that the father had been the child's "primary caregiver for over a year and had provided a very stable environment." *Id.* From this holding, Father argues that because he had primary custody of Child during the pendency of this matter, "[t]he District Court erred in disregarding this information in favor of the care provided by [Mother]."

¶24 As Mother points out in her brief, this "position is contrary to Utah law and basic logic." Such an approach might require a court to award primary caretaker status to the parent who filed for custody after only recently gaining possession of a child over the interests of the parent who had a previous, but much longer, possession. Father's position is also contrary to *Davis*. Directly following the statement that the current custody arrangement should be given special weight, the *Davis* court warned, "Of course, if the primary caregiver gained that status wrongfully, courts should be careful not to reward such conduct by giving the wrongdoer a consequential advantage in evaluating the custody question." *Id.* at 648–49. We find Father's reliance on *Davis* misplaced precisely because, as the district court noted, he gained primary caregiver status wrongfully when he "surreptitiously" and "underhandedly" took

possession of Child through "self-help." Therefore, the district court's finding was not clearly erroneous.

C.      Work Schedule Analysis

¶25    Father also challenges the district court's finding that Mother's work schedule was more conducive to her having primary physical custody. Father argues that the district court's decision "[e]ssentially . . . came down to its finding that [Mother's] work schedule, a schedule where she worked more days, but fewer hours in a two-week period than [Father] served [Child's] best interest." Father's characterization of the district court's analysis of the parties' work schedules is flawed in three respects.

¶26    First, Father fails to acknowledge that the work schedule was one of three factors the district court highlighted in Mother's favor. The court also determined that Mother was more likely to allow "frequent and continuing contact with the other parent" and that Mother had a greater bond with Child.

¶27    Second, Father asserts that in *Fullmer v. Fullmer*, 761 P.2d 942 (Utah Ct. App. 1988), this court held that it is an abuse of discretion to base a custody award on the parties' work schedules. But Father misreads that case. *Fullmer* stated that the "[district] court abused its discretion by relying on [a minor child's] placement in full-time day care to change [the child's] custody placement" because "more and more children are raised by single parents who must work." *Id.* at 948. In the present case, the district court did not punish Father for working. Rather, it stated that Mother's work schedule was more conducive to devoting more time to Child.

¶28    Third, Father ignores the totality of the evidence. Father's job as a supervisor at a coal mine required that he work variable twelve-hour shifts fourteen days out of every four

weeks. In addition, Father has a nearly one-hour commute each way to work. He admits that the length of his commute requires him to rely on his extended family and his spouse to address emergencies involving Child that might arise while he is working. In contrast, Mother works Monday through Thursday from 10:30 a.m. to 5:00 p.m. at a convenience store close to home. Her employment affords her the flexibility to leave during her shift if the need arises. Therefore, Father has not shown that the district court's finding that Mother can devote more time to Child's needs than Father was clearly erroneous.

¶29 By failing to marshal the evidence in favor of the district court's findings, Father has not met his burden of persuasion. Accordingly, we do not conclude that the findings are clearly erroneous and instead conclude that, although we might subjectively view the import of the evidence differently from the district court, we cannot say that the conclusions are against the great weight of evidence nor are we convinced that a mistake has been made.

## II. The District Court Erred in Awarding Father Minimum Parent-Time

### A. Deviation from the Informal Custody Arrangement

¶30 Father next argues that the district court erred by failing to identify a compelling reason to deviate from the informal custody arrangement—under which Child was thriving, happy, and well-adjusted—and awarding primary physical custody to Mother and parent-time to Father.[5] "The importance of the

---

5. Father contends that *Hudema v. Carpenter*, 1999 UT App 290, 989 P.2d 491, stands for the proposition that the court must have a compelling reason to disrupt a stable custody situation. We

(continued…)

myriad of factors used in determining a child's best interests ranges from the possibly relevant to the critically important. At the critically important end of the spectrum, when the child is thriving, happy, and well-adjusted, lies continuity of placement." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. "A very short custody arrangement of a few months, even if nurturing to some extent, is not entitled to as much weight as a similar arrangement of substantial duration. Of course, a lengthy custody arrangement in which a child has thrived ought rarely, if at all, to be disturbed, and then only if the circumstances are compelling." *Elmer v. Elmer*, 776 P.2d 599, 604 (Utah 1989) (cleaned up). In *Davis v. Davis*, 749 P.2d 647, (Utah 1988), a custody arrangement that had been in place for just over a year was held sufficient to establish continuity. *Id*. at 648.

---

(…continued)

disagree and find Father's reliance on *Hudema* misplaced. In that decision, a panel of this court noted, "[N]ot all continuity [of custody arrangements] is alike. A heavy emphasis on preserving stability presupposes that the prior arrangement is not only satisfactory, but will in fact continue." *Id.* ¶ 27. In *Hudema*, the mother had sole physical custody pursuant to a court order. *Id.* ¶ 3. While the district court was considering a petition to modify custody, the mother moved to another state. *Id.* ¶¶ 3–4. The district court determined that the custody arrangement could not continue due to changed circumstances. *Id.* ¶ 6. Accordingly, this court in *Pingree v. Pingree*, 2015 UT App 302, 365 P.3d 713, clarified that *Hudema* does not stand "for the proposition that a court must find compelling circumstances before ordering a change in custody when the child thrives under the current arrangement" but for the proposition that "[a] modification is premised on a finding of changed circumstances." *Id.* ¶ 13. The present case is not presented in that context.

¶31    In the present case, we note that the informal custody arrangement was temporary and had been in place for about ten months—from January 2016 until the district court's decision in November 2016—falling between the lengths of duration established in our case law. But the length of the informal custody arrangement is not the dispositive factor here. Rather, the district court recognized that the agreement could not continue because Child would be starting school the following year. And Father admits that "when [Child] turns five and begins kindergarten, the Court really does have to pick one parent for [Child] to reside with, at least Monday through Friday." Mother also acknowledges that where Child attends school is an issue that must be addressed. Thus, the district court acted within its discretion and supported its decision with adequate findings when it departed from the informal custody arrangement. An imminent change in circumstance, namely Child's starting school, required a change in the custody arrangement. Father fails to address this significant undisputed fact.

¶32    The district court acknowledged that joint physical custody would be in Child's best interests if the parties lived in the same community, but the parties' distance from each other precluded such an arrangement. Prompted by this reality, the district court weighed the factors, *see supra* ¶¶ 9–11, and concluded that Child's best interests were served by awarding Mother primary physical custody. It noted that (1) Mother had been the primary caregiver for the majority of Child's life, (2) Mother was more likely to allow "frequent and continuing contact with the other parent," and (3) Mother's work schedule was more conducive to having primary physical care of Child. As this court noted in *Kimball v. Kimball*, 2009 UT App 233, 217 P.3d 733, "if there is evidence supporting a finding, absent a legal problem—a 'fatal flaw'—with that evidence, the finding

will stand, even though there is ample record evidence that would have supported contrary findings." *Id.* ¶ 20 n.5.

¶33 Thus, we conclude that the district court did not exceed its discretion in relying on evidence of changed circumstances in departing from the informal custody arrangement and awarding Mother primary physical custody of Child.

B. The Award of Parent-Time to Father

¶34 Father argues that the district court erred in awarding him minimum parent-time, asserting that he showed by a preponderance of the evidence that he should be awarded parent-time in excess of the minimum guidelines in Utah Code sections 30-3-35 and 30-3-35.5. We agree that the district court's award of only minimum parent-time was not supported by its findings.

¶35 "[T]he parent-time schedule as provided in Sections 30-3-35 and 30-3-35.5 shall be presumed to be in the best interests of the child . . . ." Utah Code Ann. § 30-3-34(2) (LexisNexis Supp. 2018).[6] But these parent-time schedules are subject to adjustment. *See id.* The schedules represent the minimum parent-time to which the noncustodial parent is entitled unless one of the parents can establish, by a preponderance of the evidence, that more or less time should be awarded based upon a number of criteria. *See id.* Criteria relevant to the case at hand include, amongst a lengthy list, (1) the distance between the residences of the custodial and noncustodial parents, (2) shared interests between the child and the noncustodial parent, (3) involvement of the noncustodial parent in the child's community activities,

---

6. We cite to the current version of this section because the recent amendments do not affect our analysis or the issue as presented by the parties.

and (4) "any other criteria the court determines relevant to the best interests of the child." *Id*. § 30-3-34(2)(b), (h), (i), (o). Regardless of whether the court awards minimum parent-time or awards more or less than the statutory minimum, the statute requires the court to "enter the reasons underlying its order." *Id.* § 30-3-34(3).

¶36   Without specifically referencing the statutory criteria, Father contends that the following evidence supported awarding him parent-time in excess of the statutory minimum: (1) Mother's testimony that Child should have equal time with both parents; (2) neither distance nor finances made "frequent and meaningful" visitation prohibitive; (3) travel between the parents' residences was not harmful to Child; (4) Child shared a strong bond with Father and Father's wife and other children; and (5) Child thrived by following the routine in Father's household.

¶37   "It has long been the law in this state that conclusions of law must be predicated upon and find support in the findings of fact and that the judgment or decree must follow the conclusions of law. When there is variance, the judgment must be corrected to conform with the findings of fact." *Gillmor v. Wright*, 850 P.2d 431, 436 (Utah 1993). Such correction is appropriate in this case.

¶38   In the very sentence stating that it found Child's best interests were served by awarding primary physical custody to Mother, the district court also stated that it "would likely have found a joint physical custody arrangement to be in [Child's] best interests" if the parties lived reasonably close to each other. The district court reasonably concluded that the distance separating the parties' residences justified something less than equal parent-time, especially once Child starts attending school. After all, Mother and Father agree that a 100-mile commute to school is unworkable. But this distance does not prevent other possible accommodations that could be accomplished without

undue disruption to Child's school schedule, such as awarding Father additional weekend time or more parent-time over the summer vacation, fall break, spring break, and holidays.

¶39    The district court made no attempt to explain, as required by the statute, its reason for awarding minimum parent-time. *See* Utah Code Ann. § 30-3-34(3). Given the district court's findings that (1) Child was "well adjusted and doing very well pursuant" to the informal custody arrangement, (2) "[b]oth parents deeply love and are committed to [Child]," (3) "both parents are extremely motivated to be awarded physical custody of [Child]," (4) both parties offer financial and emotional support to Child, (5) "both parties spend appropriate time with" Child, (6) both parents are "fit" and "very bonded" with Child, and (7) the parties agree that Child needs a "relationship" and "substantial time with" the other parent, we would have expected that the court attempt to increase Father's parent-time over the statutory minimum. Indeed, we are hard-pressed to understand the process by which the court awarded Father minimum parent-time when—in its own words—Father should be "allowed to exercise liberal and meaningful parent time" and where Mother argued at trial that both parents should have equal time with Child. In reality, the record reflects that Mother was arguing that *she* should have enhanced parent-time, likely believing that Father would prevail as the primary caretaker. Both through the presentation of evidence and in argument, Mother supported the notion that in this case enhanced parent-time should be awarded to the non-primary caregiver. Accordingly, awarding Father the statutory minimum parent-time while simultaneously concluding that the evidence supports awarding Father "liberal and meaningful" parent-time presents a conclusion that does not follow from the findings stated.

¶40    On this single issue we determine that the district court's conclusion is not supported by its findings, and therefore the

court exceeded its discretion when it minimized Father's parent-time. Thus, we reverse on this issue because of inadequate findings and remand for additional findings and, if necessary, a reevaluation of what additional parent-time should be awarded.

## CONCLUSION

¶41    We conclude that the evidence supports the district court's findings leading it to determine that Child's best interests were served by awarding primary physical custody to Mother. We further conclude that the district court made adequate findings supported by the record to depart from the informal custody arrangement, but we conclude that the court's findings are inadequate to justify an award of only minimum parent-time to Father. Accordingly, we remand this matter for further proceedings.

—————