**2023 UT App 137**

## THE UTAH COURT OF APPEALS

MARCUS JAMES LOBENDAHN,
Appellant and Cross-appellee,
*v.*
LEEYEN MOEVAI LOBENDAHN,
Appellee and Cross-appellant.

Opinion
No. 20210278-CA
Filed November 16, 2023

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 164400262

Luke A. Shaw and Jill L. Coil,
Attorneys for Appellant

Julie J. Nelson, Daniel Ybarra, and Alexandra
Mareschal, Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Marcus James Lobendahn (Father) appeals the district court's denial of his petition to modify the parties' divorce decree. LeeYen Moevai Lobendahn (Mother)[1] also appeals the court's order denying her request for attorney fees incurred in responding to Father's petition to modify. We affirm the district court's order in all respects.

---

1. Mother has remarried and has adopted her husband's surname, Sahim.

BACKGROUND

¶2    The parties were married in 2008 in Hawaii. Following their marriage, the parties moved to Utah and had two children— a daughter and a son (Son). In May 2015, Father moved to New Jersey for employment purposes, and Mother and the children followed a little while later. Shortly after Mother arrived in New Jersey, Father asked Mother for a divorce and filed for a divorce in Utah. Mother suggested that the children live with Father in the marital apartment while she rented a separate place and cared for the children while Father was at work. Father declined the offer and advised Mother that she and the children should move back to Utah, which they did. The parties' divorce was finalized through a stipulated decree in Utah in early 2016 while Father still lived in New Jersey. The decree awarded the parties joint legal and physical custody of the children and Father parent-time under section 30-3-37 of the Utah Code with additional time during certain breaks.

¶3    Father moved back to Utah in the fall of 2016, and Mother allowed him parent-time every other weekend, similar to the schedule provided in section 30-3-35 of the Utah Code. In 2017, Father filed a petition to modify based on his relocation, and the parties resolved the petition through a stipulation modifying the decree of divorce. Based upon their agreement, Father would exercise parent-time as provided in section 30-3-35 until he moved within fifteen miles of Mother's residence in Utah County, at which time his parent-time would increase pursuant to the schedule described in section 30-3-35.1, with some modifications. Father did not move within fifteen miles of Mother and the children at that time but remarried and moved to his wife's residence in Salt Lake County. Even so, Mother allowed Father to exercise increased parent-time.

¶4    Mother sent a letter to Father in March 2018, notifying him of her intent to remarry and relocate with the children to

Washington state. A few weeks later, Father notified Mother that he had signed a lease for an apartment in an area within fifteen miles of her residence in Utah County. Father continued to reside with his wife in Salt Lake County but would stay at the apartment when exercising parent-time with the children. Thereafter, Father filed a motion to restrain Mother from relocating, which the court denied, concluding that Mother's move to Washington was in the best interest of the children. Mother remarried and moved to Washington in the summer of 2018.

¶5 While the parties were litigating Mother's relocation, Father filed a second petition to modify. Father argued that he should be awarded primary physical custody of the children, who should live with him in Utah, and that Mother should be awarded parent-time under section 30-3-37 of the Utah Code. Father's petition alleged that Mother had not been entirely truthful in describing the reasons for her relocation, that the children struggled in school upon moving to Washington, that Mother had been evasive about Father's proposal to relocate to Washington to live close to the children, that Mother interfered with his parent-time since she had relocated, that Mother had been uncooperative in planning the children's travel, and that Mother interfered with Father's participation in Son's baptism. Father also requested that a custody evaluator be appointed to make recommendations about what custodial arrangement would be in the best interest of the children, and the court granted that request.

¶6 The court appointed a custody evaluator (Evaluator), who began her evaluation in July and completed her work in November 2019. Evaluator interviewed the parties, their respective spouses, and Son, and she observed the children with both parents in their homes. At the time Evaluator conducted her evaluation, the children had lived in Washington with Mother for approximately one year. Evaluator delivered her recommendations to the parties at a settlement conference in April 2020, and completed her report five months later. Evaluator

recommended that the parties continue to share joint physical and legal custody but that the children should relocate back to Utah. Evaluator recommended that if Mother did not return with the children, Father should have primary physical custody with statutory visitation for Mother. Later, at the trial on Father's petition to modify, Evaluator advised that in her opinion—while both parents shared a close, positive relationship with the children and Mother had been the children's primary caretaker for their entire lives—Mother did not truly support the children's relationship with Father and the broad benefit of having access to Father outweighed the potential risk that a second relocation adjustment would be hard for the children. And she acknowledged that her relocation recommendation was based on her understanding that if the court ordered the children to relocate back to Utah, Mother would move back to Utah as well. Evaluator also conceded that by the time of trial, the children had lived in Washington for two-and-a-half years and that the delay between her evaluation and the trial could be significant. She agreed that "some of the facts that [she] relied on to make [her] determinations are now out of date." She agreed that the children had probably changed and matured emotionally, psychologically, socially, and physically and that she had not had any contact with the children in more than a year and a half.

¶7 The court held a trial in March 2021 on Father's petition to modify. Father's petition was based on his contention that Mother's move to Washington was selfishly motivated and harmed the children and that Mother had failed to facilitate Father's role in the children's lives and had excluded him from decision-making. Father testified about particular instances that, in his view, demonstrated Mother's inability to co-parent and unwillingness to facilitate his role in the children's lives. These included:

- Son's difficulty in school after the relocation and resultant disputes between the parties about whether to

move him to a different classroom or have him tested for autism;

- Son's baptism in July 2019 and Father's role in that event;

- Mother's apparent unwillingness to commit to living in Washington for the long term when Father was contemplating relocating there to be closer to the children;

- Father's participation in obtaining passports for the children so they could visit Mother's ill father in Tahiti and Father's contention that he did not intend to use these circumstances to coerce Mother into moving back to Utah; and

- Mother's alleged interference with Father's visitation in February 2019.

¶8 Mother testified to her version of the events and issues raised in Father's testimony. Specifically, Mother testified:

- That her decision to move from Utah was not to get herself and the children away from Father;

- That she addressed Son's difficulties in school following the relocation and how she wanted to have him tested for autism as recommended by his teacher but Father did not want the school to do any testing;

- That Son's school difficulties had mostly been resolved by the time of trial and that his recent less-than-stellar report card had more to do with remote learning than continued transition issues;

- That given Son's his age and stage of development, she believed it was appropriate to let him choose who would baptize him and where the baptism would take place and that Mother never interfered with Father's wish to perform the baptism;

- That Father caused a big scene before the baptism ceremony, which Son overheard, and Father demanded that he perform both the baptism and the confirmation;

- That when Father considered moving to Washington and asked Mother to commit to remaining in the area, Mother did not think it was wise to promise Father that she would live in Washington forever because of the constant litigation she had already experienced over custody;

- That the conflict that arose when Mother tried to obtain passports for the children in 2018 to visit her father in Tahiti after he had been diagnosed with cancer required her to file an order to show cause in December 2019 to compel Father to complete an affidavit and sign the passport applications, which he eventually did, but the children's passports did not arrive in time for them to travel to Tahiti before Mother's father passed away; and

- That Father does a good job keeping up with and supporting the children's interests.

¶9 At the conclusion of the trial, Mother asked the court to award her attorney fees.

¶10 In its written ruling issued after the trial, the court addressed Mother's alleged failure to facilitate Father's role in the children's lives. Regarding Son's baptism, the court found that Father had adduced no evidence demonstrating that Mother had

broached the subject of baptism with Son in an attempt to create contention, or that Son had suffered any psychological harm from Mother's actions. The court found, however, that the evidence admitted "demonstrates poor judgment on Father's part," that the only evidence of conflict surrounding the baptism was created by Father himself, and that the "only harm [Son] suffered was having to overhear Father yelling at [Son's] bishop . . . inside the closed bishop's office."

¶11   Regarding the circumstances surrounding obtaining the children's passports, the court was extremely critical of Father's actions. Among other things, it found that Father's actions were "senselessly cruel" and "among the most reprobate [the] court [had] encountered in a domestic relations case." It faulted Father for using "the imminent death of a grandparent as a bargaining chip" and found that his behavior "demonstrates that his control over the children's welfare must be reduced."

¶12   The court also addressed Mother's move to Washington, finding that the move did not cause the children harm or interfere with the parties' ability to co-parent. Specifically, the court determined that both parents had chosen to live in places that did not prioritize proximity to the other parent—Mother moving to Washington to remarry and attend school after living in Utah for more than three years and Father remaining in New Jersey while Mother and the children returned to Utah and then moving to Salt Lake County with his wife rather than moving to a place within fifteen miles of the children (until Mother indicated she would be relocating). Moreover, the court noted that although Father is "untethered," in that he is employed for a company that allows him to work from home and he could live and work anywhere, he is unwilling to move unless Mother commits to remain in Washington, which she had not done because she eventually wants to work as a pharmacist and may need to move for that career. The court found that Father's decision to remain in Utah

despite his ability to move reflects his choice not to live close to the children.

¶13 As far as the children's best interest in staying in their current placement, the court found that Mother's spouse has an extensive family network with whom the children have grown close and share a Pacific Islander heritage. Besides a strong family connection, the children also have close friends in the area, which the court found to be good for the children. And due in part to the length of time spent in Washington, the court found that "[o]verall, the children's social network is stronger in Washington" than in Utah. The court also determined that no evidence supported Father's assertion that the move to Washington caused Son to have behavioral issues at school. If anything, Father's refusal to allow Son to be tested for autism or to allow him to change classrooms when he started having trouble has potentially caused continuing suffering for Son and created stalemates between the parents that Father chose to address in the courts. Father's proclivity for litigation, which he can afford and which the court found bordered on harassment, caused harm to the children, created unpredictability, and demonstrated less-responsive parenting.

¶14 The court found that both Mother and Father have capacity to parent and to co-parent and have excellent parenting skills. But the court determined that Mother "exhibits greater respect of Father's role than Father does of Mother's." Specifically, the court found that "[w]hen the children ask Mother a question on which Father should be consulted, she tells them 'I'll talk to your dad about that and we'll decide together.'" The court recognized that the children's bond with Father is very strong, but it agreed with Evaluator that "the children are more bonded with Mother in light of being under her primary care for their entire lifetimes."

¶15 The court analyzed the custody factors found in section 30-3-10(2) of the Utah Code and made the following determinations:

- Both parents demonstrate an appropriate understanding of, and responsiveness to, the developmental needs of the children, but Mother's openness to the advice and assistance of professionals exceeds Father's.

- Both parents have an excellent capacity to parent and co-parent and endorse the other's role in the presence of the children. Except for Mother's use of inappropriate terms in some of her written communication (which the court believed was on the mend), "both parents appropriately communicate with the other, encourage the sharing of love and affection, and exhibit a willingness to allow frequent and continuous contact with the other parent." However, Mother exhibits a greater respect for Father's role in the children's lives than Father does for Mother's.

- Father has relinquished both custody and parent-time in the past.

- Both parents desire custody and time with the children. Mother has been the primary caretaker and Father has made it a priority to maintain good contact with the children. But "Mother's commitment to the care and custody of the children exceeds Father's."

- Both parents have always cared for the children financially and are financially responsible, but "Mother has expressed more constant and less evasive financial responsibility than Father."

- The children enjoy a strong social and familial network in Washington with their stepfather and his side of the family and have close friends there. The children also enjoy the close proximity of their stepmother and her

family and their maternal aunt and grandmother in Utah. Overall, the children's social network is stronger in Washington.

- The children are more bonded to Mother because she has always been their primary caretaker.

- The children have both benefitted and suffered from the sharing of parental responsibilities. Father is very involved and committed to his role. "But Father's veto-power over decisions regarding the children's health, education, and welfare" has prevented Son from being tested for autism, prevented Father from honoring Son's preferences at his baptism, and "prevented the children from traveling to see their dying grandfather in Tahiti."

- The parents are generally able to cooperate with each other and make decisions jointly but struggle to reach agreement on significant decisions in the children's best interest and these frequent stalemates harm the children. Specifically, the court noted that the parents could not communicate effectively to make Son's baptism conflict-free and they could not agree on how to address Son's difficulties in school after the relocation or obtain passports for the children. "Given her less affluent status, Mother usually surrenders in the face of disagreement because she cannot afford to take the matter further. Father, however, has substantial funds at his disposal, and has exhibited the ability and willingness to press his concerns in the courts."

- Both parents ensure that the children are protected from conflict, except for Father's refusal to complete the passport paperwork to allow the children to travel to

Tahiti, which harmed the children, and allowing Son to overhear the conflict over his baptism.

¶16 After weighing the evidence and the statutory factors, the court concluded that granting Father's petition and relocating the children back to Utah would not be in their best interest. The court found that the children are doing well in their current circumstances and that they are primarily bonded with Mother as their primary caretaker. "Father has presented no evidence that removing primary custody from Mother would be in the children's best interests. . . . [Rather,] doing so would be harmful to the children." The court determined that "the children are happy in Washington, that the parties have successfully mitigated the effects of distance on parent-time, that Father continues to enjoy a healthy relationship and strong bond with the children, and that the current custody arrangement is working well." The court noted that the trial evidence "establish[ed] that [Father] and Mother have been extraordinarily successful in managing the geographical distance between them," "that the children do not grasp the gravity of the distance," and that "all evidence indicates that the children are happy, thriving, and well-adjusted in the current circumstances." The court found that none of the statutory custody factors favored a change in custody.

¶17 Accordingly, the court denied Father's petition to modify custody and his request that he be awarded primary custody if Mother did not relocate to Utah. The court ordered joint legal custody to continue but awarded Mother final decision-making authority as to the children's health, education, and welfare. It also ordered that Mother "should be designated as the parent with the sole legal right to determine the residence of the children." The court denied Mother's request for an award of attorney fees because (1) she presented no evidence of her need for such an award and (2) even though Mother had ultimately prevailed, Father's petition was not frivolous because it had been supported by Evaluator's recommendation for a change in

custody. But the court then explained that it chose to disregard the custody evaluation because it was "outdated and fail[ed] to adequately address the evidence presented at trial."

ISSUES AND STANDARDS OF REVIEW

¶18    Father now appeals the court's denial of his petition to modify, including its decision to reject Evaluator's recommendation. "We review custody determinations under an abuse of discretion standard, giving the district court broad discretion to make custody awards." *Hinds v. Hinds-Holm*, 2022 UT App 13, ¶ 26, 505 P.3d 1136 (quotation simplified). We will not disturb a district court's findings of fact unless they are clearly erroneous. *See Robertson v. Robertson*, 2016 UT App 55, ¶ 5, 370 P.3d 569. And "[a]lthough a district court is not bound to accept a custody evaluator's recommendation, the court is expected to articulate some reason for rejecting that recommendation." *R.B. v. L.B.*, 2014 UT App 270, ¶ 18, 339 P.3d 137.

¶19    Mother cross-appeals and challenges the court's denial of her request for attorney fees. We review a district court's attorney fee determination for an abuse of discretion. *Jensen v. Jensen*, 2009 UT App 1, ¶ 7, 203 P.3d 1020.

ANALYSIS

¶20    Father argues the district court erred in denying his petition to modify. Father's challenge comprises two parts. First, Father takes issue with the court's weighing of the evidence and its associated factual findings and conclusions. Second, Father challenges the court's decision to reject Evaluator's recommendation. We address each of Father's arguments in turn. Lastly, we address Mother's cross-appeal concerning the denial of her request for attorney fees.

## I. The Evidence Supports the District Court's Determination to Deny the Petition to Modify

¶21　Father's first argument on appeal is that the district court ignored the evidence presented at trial that supported Father's position that it was in the best interest of the children to move them back to Utah and that he should be awarded primary custody if Mother did not relocate with them. Father also argues that the court viewed the evidence presented from a biased perspective. In the context of determining custody, the district court is to analyze the best interest of the children through the custody factors outlined in section 30-3-10(2) of the Utah Code. Generally, it is within the court's discretion to consider each custody factor and accord each factor the appropriate weight. *See Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. The "court's discretion stems from the reality that in some cases the court must choose one custodian from two excellent parents, and its proximity to the evidence places it in a more advantaged position than an appellate court." *Tucker v. Tucker*, 910 P.2d 1209, 1214 (Utah 1996). Thus, a custody determination "may frequently and of necessity require a choice between good and better." *Hogge v. Hogge*, 649 P.2d 51, 55 (Utah 1982).

¶22　While the district court is accorded discretion in weighing the statutory custody factors, "it must be guided at all times by the best interests of the child," *see Tucker*, 910 P.2d at 1214, and it "must set forth written findings of fact and conclusions of law which specify the reasons for its custody decision," *see id.* at 1215. "Whenever custody is contested, the district court must provide the necessary supporting factual findings that link the evidence presented at trial to the child's best interest and the ability of each parent to meet the child's needs." *K.P.S. v. E.J.P.*, 2018 UT App 5, ¶ 27, 414 P.3d 933.

¶23　Moreover, the factual findings of the district court "will not be disturbed unless they are clearly erroneous" by being "in

conflict with the clear weight of the evidence." *Kimball v. Kimball*, 2009 UT App 233, ¶ 14, 217 P.3d 733 (quotation simplified). And "the existence of conflicting evidence is not sufficient to set aside a [district] court's finding." *Bond v. Bond*, 2018 UT App 38, ¶ 6, 420 P.3d 53 (quotation simplified). Rather, "to successfully challenge a [district] court's factual findings on appeal, the appellant must overcome the healthy dose of deference owed to factual findings by identifying and dealing with the supportive evidence and demonstrating the legal problem in that evidence, generally through marshaling the evidence." *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (quotation simplified).[2] Thus, a party challenging the sufficiency of the evidence to support a custody decision will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal. *See State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645. In addition, a district court "may make findings, credibility determinations, or other assessments without detailing its justification for finding particular evidence more credible or persuasive than other evidence supporting a different outcome." *Shuman v. Shuman*, 2017 UT App 192, ¶ 6, 406 P.3d 258 (quotation simplified), *cert. denied*, 412 P.3d 1257 (Utah 2018).

---

2. As this court stated in *Kimball v. Kimball*, 2009 UT App 233, 217 P.3d 733:

> After all, it is the [district] court's singularly important mission to consider and weigh all the conflicting evidence and find the facts. No matter what contrary facts might have been found from all the evidence, our deference to the [district] court's pre-eminent role as fact-finder requires us to take the findings of fact as our starting point, unless particular findings have been shown, in the course of an appellant's meeting the marshaling requirement, to lack legally adequate evidentiary support.

*Id.* ¶ 20 n.5.

¶24 On appeal, Father asserts that the district court ignored evidence that was presented to Evaluator and to the court at trial. But on appeal, Father has not wrestled with the evidence that supports the court's conclusion that most of the custody factors favor Mother, and he has made no attempt to marshal the evidence that supports the court's factual findings. Father "clearly views the evidence as compelling a different outcome, but it is not within our purview to engage in a reweighing of the evidence, and [Father] has not demonstrated that the evidence underlying the [district] court's findings is insufficient." *See id*. ¶ 9 (quotation simplified). We address Father's specific challenges to the court's conclusions below.

A. Father's relinquishment of parent-time with the children by voluntarily choosing not to live close to them

¶25 Father complains that the district court misunderstood and ignored the evidence when it determined that Father had made decisions that minimized his parent-time. But Father has not addressed the evidence the court chose to credit nor demonstrated how that evidence was insufficient for the court to conclude that Father had not prioritized living close to the children to maximize his parent-time. That is, the court found the following evidence convincing:

- While the family lived in New Jersey in 2015, and after Father announced he wanted a divorce, Mother offered to move out of their apartment so the children could remain with Father. Father declined this offer and advised Mother to return to Utah with the children.

- Father remained in New Jersey for over a year before moving back to Utah.

- After the parties mediated a settlement in August 2017 wherein Father could exercise more parent-time if he

moved within fifteen miles of Mother's residence, he did not do so. Instead, Father remarried in 2018 and moved to his wife's residence in Salt Lake County (Mother's residence was in Utah County).

- Father rented an apartment within fifteen miles of Mother's residence in Utah County only after she had announced her intention to relocate to Washington.

- Father is employed by a company that allows him to work from home and his wife does not work outside the home, so Father's employment does not necessarily tie him to Utah. Father has even shopped for houses in Washington but requires a commitment from Mother that she will remain there long term before he will move.

- Evaluator opined that despite Father's valid professional and financial motives for staying in New Jersey and then in Utah, Father failed to capitalize on the opportunity for more frequent parent-time by living close to the children.

¶26 Father appears to fault the court for not considering dispositive his testimony that he sought and exercised more than the minimum parent-time once he returned to Utah in 2016. Father asserts that this evidence disproves the court's determination that Father had not prioritized his time with the children. But "Father [doing] what was within his rights . . . to exercise the expanded parent-time" was not persuasive to the court given the evidence listed above. And Father has not challenged any of the factual findings that support the court's conclusion that he did not make choices for his living situation to be closer to the children. Father simply challenges how the court considered the evidence that supports his position.

¶27 The existence of conflicting evidence in the record is not sufficient to set aside a district court's findings. *See Nebeker v. Orton*, 2019 UT App 23, ¶ 16, 438 P.3d 1053. "The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a fatal flaw—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." *Kimball*, 2009 UT App 233, ¶ 20 n.5 (quotation simplified). The district court's "mission" is "to consider and weigh all the conflicting evidence and find the facts." *Id*. Thus, even though "contrary facts might have been found from all the evidence," this court defers to the district court's "pre-eminent role as fact-finder," and we "take the findings of fact as our starting point, unless particular findings have been shown . . . to lack legally adequate evidentiary support." *Id*. Because Father has not directly challenged any of the court's subsidiary findings supporting its determination that Father made decisions that minimized, rather than maximized, his parent-time, we will not reweigh the evidence.

B.    The circumstances surrounding Son's baptism

¶28 Father complains that the issue surrounding Son's baptism "is an issue of legal custody . . . [and] should [have been] discussed between the parents before decisions [were] made." Father asserts that the district court committed legal error when it failed to rule that a decision about who will perform a child's baptism is a major parenting decision that should not be left up to a child. Father also takes issue with the court crediting Mother's testimony about the dispute that occurred before the baptism—and not Father's testimony that he did not agree with the accounts that he was yelling or losing his cool—to determine that the circumstances of the event demonstrated poor judgment on Father's part and that Father's actions caused Son harm.

¶29    On the facts of this case, we cannot fault the district court for its determination that who performs the various parts of a child's religious ceremonies within the shared religious tradition of both parents (as opposed to whether the ceremonies will be performed at all) is not a major parenting decision requiring the agreement of both parents. Father cites no authority for the proposition that the decision about who performs a religious ceremony is equivalent to decisions concerning a child's medical care, school attendance, or overall religious practice. Nor has Father challenged any of the factual findings that support the court's conclusion that Father had failed to demonstrate that Mother's decision to allow Son to have "input regarding his own baptism was an unhealthy or unwise parenting decision." Thus, Father cannot show the court erred in considering this decision to be something other than a major parenting decision. And while we understand that Father is unhappy with the court's conclusion that Father's behavior before Son's baptism showed poor judgment on his part rather than ineffective co-parenting on Mother's part, the evidence in the record supports the court's conclusion that Mother's parenting regarding the baptism was not problematic, and we will not reweigh the evidence.

C.    The circumstances surrounding having Son tested for autism

¶30    Father next takes issue with the court's findings about whether the children have benefitted from the parties' sharing of parenting responsibilities and about the abilities "of the parents to give first priority to the welfare of the [children] and reach shared decisions in the [children's] best interest." *See* Utah Code § 30-3-10.2(2)(b). Among other things, in determining that Mother should be designated the final decision-maker as to the children's health, education, and welfare, the court found that Father exhibited an "injudicious use of his veto power over decisions relating to the children's health" and had "evidenced [a] tendency to act contrary to the children's interests and to use those interests

as leverage against Mother." But Father's complaint that the evidence demonstrated that he suggested they not rush into testing Son for autism rather than that he objected to the testing does not diminish the court's determination that "Father's veto-power over decisions regarding the children's health, education, and welfare [] prevented [Son] from being tested for autism at a time when educational professionals believed the test would be helpful to address his needs." Thus, we agree with Mother that "[e]ven if the court should have used the word 'delayed' rather than 'prevented'" in its finding, Father has not shown how the court's decision to award Mother final decision-making authority was an abuse of discretion or legal error.

D.     The circumstances surrounding obtaining the children's passports

¶31    Father next challenges the court's view of the circumstances surrounding Mother's attempts to obtain passports for the children in time to visit her cancer-stricken father in Tahiti in 2019. Father argues that the court's pointed and direct comments about this incident are overly aggressive and suggest that this evidence was the "ultimate basis for [the court's] ultimate conclusion." Father asserts that he did not interfere with the passport applications or attempt to condition his facilitation of the passports upon Mother's promise to return to Utah and suggests that Mother was at fault for not obtaining the passports in time. But, once again, on appeal, Father selectively highlights the evidence he submitted at trial, asserts that the evidence supports a different outcome, and criticizes the court for not crediting his testimony rather than Mother's. It is not this court's "purview to engage in a reweighing of the evidence." *Shuman v. Shuman*, 2017 UT App 192, ¶ 9, 406 P.3d 258 (quotation simplified), *cert. denied*, 412 P.3d 1257 (Utah 2018). In fact, when "a foundation for the court's decision exists in the evidence, [we] may not engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. On appeal, this court will look to whether the district court's

decision is supported by the evidence and in cases where the appellant has "merely point[ed] to evidence that might have supported findings more favorable to them" rather than "identify[ing] flaws in the evidence relied on by the [district] court that rendered" the court's findings clearly erroneous, we will not reverse. *Shuman*, 2017 UT App 192, ¶ 8 (quotation simplified). Because the court's decision is supported by the record and Father has identified no fatal flaws in the evidence upon which the court relied, we will not reweigh the evidence.

E.      The reasons and representations given for Mother's relocation to Washington

¶32     Father next challenges the court's view of Mother's relocation. Father appears to attack Mother's honesty and credibility by asserting that the reasons she gave for her move to Washington were not true. But Father did not appeal the court's order approving Mother's relocation, and by not directly challenging the district court's findings about Mother's move, Father has failed to persuade us that the court's determination that "Mother's move to Washington was not contrary to the children's interests" was an abuse of discretion or legal error since it "is undisputed that the children are thriving and happy there".

F.      The district court's custody factor findings

¶33     Father challenges the court's determination that evaluation of the statutory custody factors favored denying his petition to modify and awarding Mother more decision-making authority. Specifically, Father argues that the court's analysis of the custody factors is not supported by the evidence with regard to (1) the parents' commitment to the care and custody of the children, (2) not disrupting a custody arrangement where the children are happy and well-adjusted in their current circumstances, (3) the respect each parent affords the other parent's role, (4) the parents'

ability to make decisions jointly, and (5) whether it was better to remain in Washington versus returning to Utah.

¶34 But Father does not tie his argument to a particular custody factor or explain how the court's findings in these areas are critically important to the overall custody determination. Nor does Father explain how the court's findings on these factors are against the clear weight of the evidence. "Generally, it is within the [district] court's discretion to determine . . . where a particular factor falls within the spectrum of relative importance and to accord each factor its appropriate weight." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. "While the district court is accorded discretion in weighing these factors, it must be guided at all times by the best interests of the child." *Hinds v. Hinds-Holm*, 2022 UT App 13, ¶ 30, 505 P.3d 1136 (quotation simplified).

¶35 Father's argument that the court disregarded the evidence that supports his preferred evaluation of the statutory custody factors is not persuasive. It is not this court's role to reweigh the evidence to see if we would reach a different conclusion from that of the district court. Father has not demonstrated that the court's evaluation of the custody factors lacks evidentiary support or that any finding regarding each factor is against the clear weight of the evidence. Given this, we cannot say that the court abused its discretion or committed legal error in concluding that "none of the factors favor a change in custody" or that "[t]he critically important factors—bonding and continuity of placement—strongly favor leaving primary custody with Mother."

¶36 In sum, Father has not directly challenged any of the court's specific findings supporting the determinations listed above. Indeed, he simply highlights evidence he claims the district court ignored. Without a direct challenge to any specific finding, we consider the district court's findings as established and will not reweigh the evidence.

## II. The District Court Did Not Abuse Its Discretion When It Rejected Evaluator's Recommendation

¶37 Father contends that the district court erred in rejecting the recommendations and testimony of Evaluator. "Courts are not bound to accept the testimony of an expert and are free to judge the expert testimony as to its credibility and its persuasive influence in light of all of the other evidence in the case." *Barrani v. Barrani*, 2014 UT App 204, ¶ 4, 334 P.3d 994 (quotation simplified). "This is because . . . the fact-finder is in the best position to judge the credibility of witnesses and is free to disbelieve their testimony . . . even if that testimony comes from an expert witness." *Woodward v. Lafranca*, 2016 UT App 141, ¶ 13, 381 P.3d 1125 (quotation simplified), *cert. denied*, 384 P.3d 570 (Utah 2016). These principles apply to a court's assessment of the opinions offered by a custody evaluator. Indeed, a "district court is not bound to accept a custody evaluator's recommendation," but if a court chooses to reject the evaluator's opinion, it "is expected to articulate some reason for" doing so. *See R.B. v. L.B.*, 2014 UT App 270, ¶ 18, 339 P.3d 137. In this case, while the court could have perhaps more fully explained its reasons for rejecting Evaluator's recommendations, in our view the court had sufficient reasons for doing so and adequately explained itself.

¶38 Father first contends that the district court erroneously rejected Evaluator's recommendations because the court had unreasonable expectations of Evaluator, that it was incumbent on the court to solicit further information from Evaluator through questioning at trial if the court thought her report was insufficient, and that the court should have accepted Evaluator's recommendation without question because the court did not contest her qualifications and admitted her report into evidence without objection. But the record does not support Father's complaints, and he does not support his argument with legal citation. The court invited Evaluator to augment her report at trial by "putt[ing] in context or explain[ing] or add[ing] flesh to the

bones of the report," and the court dialogued at length with Evaluator during direct questioning and cross-examination. Father's complaint that the court discouraged additional testimony or additional explanation from Evaluator because it stated during her examination that "[n]ow that I have received the report, if she's just going to read it, maybe there's more effective ways for her to spend her time" is not compelling, especially because Father's counsel agreed to "expedite the process a bit" by then focusing on Evaluator's recommendations. Thus, Father does not persuade us that the court abused its discretion or committed legal error in choosing not to ask Evaluator further questions.

¶39 Next, Father takes issue with the court's decision to reject Evaluator's recommendation because it was "outdated" at the time of trial.[3] But Father fails to acknowledge that while all the statutory custody factors are equally important, "[a]t the critically important end of the spectrum, when [a] child is thriving, happy,

---

3. In addition to rejecting Evaluator's report for being outdated, the court rejected the report because it "fail[ed] to adequately address the evidence presented at trial." Specifically, the court noted that the report "mentions but glosses over Father's sending the children away from New Jersey, choosing several times thereafter not to live near the children (including now), preventing them from traveling to Tahiti, and declining to engage [Son] regarding his baptism." Father takes issue with the court's reasoning on each point, arguing that the court "did not agree with [Evaluator's] expert view and analysis of the evidence." But his argument is limited to merely explaining his view of why each of these events happened and why Evaluator did not find them important. Father does not show that the court's view was unsupported by the evidence. And regardless of these stated reasons, the court's decision to reject the report because it was outdated was entirely proper.

and well-adjusted, lies continuity of placement." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. Utah law requires courts to "give substantial weight to the existing joint legal . . . custody order when the child is thriving, happy, and well-adjusted." Utah Code § 30-3-10.4(2)(c). And here, the court relied heavily on continuity of placement as the basis for rejecting Evaluator's report. The court found that the evidence presented at trial was "virtually unanimous" in establishing that the children were "happy, well-adjusted, and thriving under [their] current arrangement" and it rejected Evaluator's contention that relocating the children back to Utah would not be that big of a deal because "[w]e don't have a child . . . moving into a different developmental phase or a child with specific developmental needs." Because the court heard the evidence on both sides and it explained why it was rejecting certain evidence, the court did not abuse its discretion or commit legal error. Thus, we see no infirmity in the court's determination that Evaluator's report was outdated by the time of trial.

¶40 We are, of course, sensitive to the emotional undercurrents giving rise to Father's challenges on appeal. This appears to have been a very difficult case for both parties—both of whom love and care for their children. And we acknowledge the district court's determination that both "parents are well suited to parent the children [who] are surrounded by an unusual amount of love on both sides of the family. . . . All children everywhere deserve to be loved as much as these children are." But ultimately, the fact that Father disagrees with the court's decision to deny his petition to modify does not render the district court's findings inadequate or unsupported by the evidence, nor does it require an outright grant of custody in his favor. *See Shuman v. Shuman*, 2017 UT App 192, ¶ 10, 406 P.3d 258, *cert. denied*, 412 P.3d 1257 (Utah 2018).

¶41 In sum, Father has failed to meaningfully address the evidence supporting the district court's findings or persuasively demonstrate that those findings are against the clear weight of the

evidence or legally erroneous. We therefore affirm the district court's denial of Father's petition to modify custody and its associated adjustment to the parties' legal custody arrangement.

### III. Mother's Attorney Fees Request

¶42 Finally, we address Mother's challenge to the district court's denial of her request for attorney fees incurred in responding to Father's petition to modify. Mother asserts entitlement to fees under two different statutes, but we reject both of her arguments.

¶43 First, Mother claims that the court should have awarded her fees pursuant to a statute authorizing a court to award fees in cases where the "action" was "filed or answered frivolously and in a manner designed to harass the other party." *See* Utah Code § 30-3-10.4(5). The court determined that whether the litigation was frivolous or filed with the intent to harass was "a very close call" but that Evaluator's change-of-custody recommendation provided Father with at least some basis to file his petition. We agree. The district court has discretion to determine whether an action was filed frivolously or with an intent to harass, and we will not substitute our judgment for that of the district court unless the action it takes is so flagrantly unjust as to constitute an abuse of discretion. *See Wall v. Wall*, 700 P.2d 1124, 1125 (Utah 1985). We discern no abuse of discretion in the court's determination not to award fees under section 30-3-10.4(5) of the Utah Code.

¶44 Second, Mother claims that the court should have awarded her fees under a different statute, one that authorizes courts to order one party to pay fees to the other in order "to enable the other party to prosecute or defend the action." *See* Utah Code § 30-3-3(1). The court denied Mother's request for fees under this statute based on its determination that Mother did not produce evidence of her financial need. When reviewing requests for

attorney fees in divorce proceedings, "both the decision to award attorney fees and the amount of such fees are within the [district] court's sound discretion." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 10, 176 P.3d 476 (quotation simplified). However, the party to be awarded attorney fees under this statute has the burden to prove (1) that the payee spouse has a financial need, (2) that the payor spouse has the ability to pay, and (3) that the fees requested are reasonable. *See Dahl v. Dahl*, 2015 UT 79, ¶ 168, 459 P.3d 276.

¶45    Here, Mother argues that the district court erred in concluding that an award of fees was not warranted when it determined that "Mother did not adduce any evidence of her need for an award of attorney's fees under section 30-3-3(1)." Mother contends that there was evidence before the court to demonstrate her need and Father's ability to pay. Specifically, Mother points to the parties' stipulated order from 2017 that showed the parties' incomes and the custody evaluation that reported the parties' incomes in 2020. But Mother did not point to this evidence in connection with her fee request, and we do not think it is incumbent on a district court to comb through the record to find evidence of a party's need. Rather, the party to be awarded fees has the burden to submit that evidence or at least point the court to that evidence and ask that the court utilize that evidence to determine need.

¶46    Accordingly, we affirm the district court's conclusion that fees were not warranted in this case.

CONCLUSION

¶47    We conclude that the evidence supports the district court's findings and conclusions that relocating the children back to Utah would not be in the children's best interest and supports the denial of Father's petition to modify. We further conclude that the

district court did not abuse its discretion in denying Mother's request for attorney fees. Affirmed.

———————