**2024 UT App 164**

## THE UTAH COURT OF APPEALS

JAMES DOUGLAS WALLACE,
Appellee,
*v.*
JOANNA JUNE WALLACE,
Appellant.

Opinion
No. 20220559-CA
Filed November 15, 2024

Third District Court, Salt Lake Department
The Honorable Laura S. Scott
No. 194904789

S. Mark Barnes, Attorney for Appellant

Alison Satterlee and Virginia Sudbury,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

ORME, Judge:

¶1   Less than two years after James Douglas Wallace and
Joanna June Wallace[1] divorced pursuant to a stipulated divorce
decree, both parties filed motions to modify the decree. After
contentious litigation, the trial court entered a modified divorce
decree and later an amended modified divorce decree.

---

1. Since divorcing James, Joanna has remarried. She now goes by
Joanna June Smith. Her new husband, S. Mark Barnes, represents
her on appeal and represented her in the proceedings before the
trial court.

¶2    On appeal, Joanna makes several arguments.[2] She first contends that the trial court erred in ruling that the non-disparagement provision she agreed to in the stipulated divorce decree did not violate her First Amendment right to free speech. She also challenges various provisions of the amended modified divorce decree: the child support award, the summer parent-time schedule, and a warning that failure to pay the special master fees may result in a change in legal custody. She also disputes the court's denial of her request for attorney fees. For the reasons set forth below, we affirm.

BACKGROUND

*Stipulated Divorce Decree*

¶3    James and Joanna got married in 2001 and share four children—two of whom are still minors.[3] In early 2017, the parties, both represented by counsel, divorced pursuant to a stipulated divorce decree. The parties agreed to joint physical and legal custody of the children. They designated Joanna as the primary physical custodian and the "primary for purposes of education and medical decisions," with James having parent-time pursuant to a statutory schedule.

---

2. Because the parties share the same last name, we refer to them hereafter by their first names, with no disrespect intended by the apparent informality.

3. At the time of divorce, all four children were minors. During litigation on the parties' petitions to modify, their eldest child reached majority, and a second child reached majority during the pendency of this appeal.

¶4      The parties also agreed that James would pay Joanna monthly child support. Concerning their eldest child (EPW), they agreed to the following provision:

> EPW has special needs. The parties shall augment child support in the amount of $500 per month. Child support for EPW (including the augmented amount) shall continue until EPW achieves the age of 21. At the time EPW is 21 the parties will review EPW's medical evaluations and work cooperatively together to make a plan for his support into adulthood.

¶5      The decree also included the following stipulation concerning non-disparagement:

> In an effort to keep a peaceful co-parenting relationship, both parties shall be mutually enjoined and restrained from making negative, disparaging or derogatory comments to or about each other. This provision includes all communication between the parties or to third parties, whether by text message, email, direct phone calls, voice messages or face-to-face communication.
>
> . . . Both parties shall be mutually enjoined and restrained from communications about or involving past marital incidents, past blame, or other personal attacks. This type of communication shall be deemed as harassment, breaching personal boundaries and in violation of the parties' agreement. . . .

*Modified Divorce Decree*

¶6      In August 2018, James filed a petition to modify the stipulated divorce decree, asserting substantial changes in

circumstances. In relevant part, he claimed that the children's needs had changed; that Joanna, having worked two nearly full-time volunteer positions, was now able to enter the workforce; and that she had failed to abide by certain terms in the stipulated divorce decree. Joanna's new husband, S. Mark Barnes, an attorney, represented her in the ensuing litigation. In opposing the petition, Joanna argued that James had not met his burden of showing a substantial change in circumstances and that he was merely upset with what he now considered "a bad deal."

¶7      Also in 2018, James filed what is now called a motion to enforce. *See* Utah R. Civ. P. 7B(a), (j); *Elder v. Elder*, 2024 UT App 68, ¶ 14 n.3, 550 P.3d 488 (explaining that "[u]nder a rule that became effective in May 2021 and that remains in place, a motion for an order to show cause in a domestic relations action is now referred to as a motion to enforce") (quotation simplified). In the motion, James claimed that Joanna failed to abide by the stipulated divorce decree's non-disparagement provision by consistently posting negative comments about him on social media. In his supporting declaration, James asserted that because of Joanna's posts, he had been threatened online by complete strangers. Joanna responded that the non-disparagement provision did not specifically prohibit the parties from posting about each other on social media. She also contended that her posts were not intended to be disparaging and that she was "simply sharing her experiences and supporting those who have suffered through difficult marriages and divorces." The trial court ruled that Joanna's social media posts were "publicly made" and that due to the non-disparagement provision's broad language, "it is proper to interpret social media postings as postings made to third parties" in violation of the non-disparagement provision. Nevertheless, because Joanna had not made any further posts at that time, the court did not hold her in contempt, but it directed

her to take down all the social media posts that James referenced in his filings.[4]

¶8    In August 2019, based on the stipulation of the parties, the trial court entered an order appointing a special master. The order also directed that the parties each pay half of the special master's retainer fee and that the special master "may suspend services based upon the failures of either party to maintain their financial obligations." In November 2019, the special master withdrew. James subsequently filed another motion to enforce, asking the court to find, among other things, that Joanna failed to comply with the court's order to pay her half of the special master fee and seeking appointment of another special master. Joanna responded that she timely paid all amounts the special master requested and that the special master never communicated to her that she had an outstanding balance.[5]

¶9    In April 2020, EPW began living with James full-time following two incidents in which Joanna called the police on EPW. After the second incident, Joanna told EPW that he could not live with her. After EPW moved in with James, Joanna texted and

---

4. The judge who ruled on this motion to enforce was not the judge who ruled on the later 2019 motion to enforce and conducted the bench trial on the parties' motions to modify the stipulated divorce decree.

5. Following the bench trial on the parties' later motions to modify the divorce decree, the court addressed the issue of the special master and ordered that a new one be appointed. *See infra* ¶ 14. In its subsequent findings of fact and conclusions of law, the court declined to impose sanctions on either party for various pending motions to enforce, holding that neither party had persuaded the court that sanctions were warranted even if contempt were shown.

called "hundreds" of times and contacted police several times to conduct welfare checks on EPW even though she had no reason to believe he was not safe with James. James then obtained a temporary stalking injunction against Joanna, which prevented her from contacting EPW and awarded him temporary custody of all the children. But the temporary injunction was later dismissed after a hearing. And following the bench trial in the matter currently before us, the trial court found that regardless of whether James was justified in obtaining the temporary injunction to give EPW "some time to process and heal," James had "no good faith reason" to list the other three children as "protected parties" under the injunction.

¶10 In May 2020, James filed an amended petition to modify the stipulated divorce decree, now seeking sole custody of EPW, joint physical custody of the remaining three children, and requesting that he be granted "the tie-breaking vote for legal custody decisions." Joanna filed a counter-petition to modify seeking, in relevant part, sole legal and physical custody of all the children, with James having parent-time, and requesting that child support be recalculated based on the parties' current gross monthly incomes. Due to the contentious nature of the litigation, a private guardian ad litem (the PGAL) was appointed to represent the children's best interest.

¶11 In late 2021 and early 2022, the trial court held a four-day bench trial on the competing motions to modify. In April 2022, the court issued findings of fact and conclusions of law, and it entered a modified divorce decree the following month.

¶12 The court indicated that this case was "one of the most difficult cases [it] has ever had." It noted that the parties "appear to be clinging to their anger and resentment towards each other, which is clouding their judgment and interfering with their ability to put the needs of the Children above their own," resulting in the children "experiencing stress, anxiety, and depression." The court

then entered extensive findings regarding certain incidents (including those that led to EPW living full-time with James and the subsequent application for a temporary stalking injunction), as well as the parties' lack of insight concerning their own roles in conflicts, their refusal to give each other the benefit of the doubt, their refusal to cooperate with each other, their inability to communicate appropriately, their disparagement of each other, and their involvement of the children in their disputes. In addressing disparagement, the court found, in relevant part, that Joanna made social media posts alleging that James "abus[ed] her and attempt[ed] to 'infiltrate progressive and feminist spaces'" and that he refused to help EPW, who she claimed was "in danger" and "not safe."[6] The court also found that Joanna had continued to post about James on social media even after the prior order to take down her earlier posts, which order was entered in response to James's 2018 motion to enforce.

¶13   Due to the immense conflict that had arisen from the initial custody arrangement, which conflict had negatively impacted the children, the court concluded that substantial material changes in circumstances warranted a change in physical and legal custody of the three children who remained minors—EPW having turned 18 at that point.[7] The court granted Joanna sole physical and legal

---

6. Regarding Joanna's concerns that EPW was in danger after he went to live with James full-time, the court found that Joanna "was actually concerned about . . . the danger to her relationship to [EPW], not to [EPW] himself."

7. The trial court noted that because the original divorce decree was entered pursuant to the parties' stipulation, and thus custody was being adjudicated for the first time on the parties' competing petitions to modify, a lesser showing than a material and substantial change in circumstances applied. *See Zavala v. Zavala*, 2016 UT App 6, ¶ 17, 366 P.3d 422. Nevertheless, the court stated

(continued…)

custody of the elder of those three children (LW), with James having eventual parent-time with her. But because LW, who was 17 at the time, had a strained relationship with James, on the recommendation of the PGAL the court clarified that it was "not ordering parent-time and overnights as a schedule *per se*." Instead, the court ordered that the parties and LW, together with a therapist, work on taking "small, incremental steps toward parent-time" with James.

¶14    Regarding the two youngest children, the court held that the parties should continue to share joint legal and physical custody but that modification to parent-time and final decision-making authority was warranted. The court awarded each party equal parent-time with the youngest children. On the PGAL's recommendation, the court ordered that the parties' summer parent-time be on a week-on/week-off schedule but that the parties may agree in writing to change the summer parent-time schedule. As for legal custody, the court held that it was in the children's best interest to appoint a special master "who will have binding authority to make decisions on behalf of [the youngest children] if the parties are unable to agree." The court ordered that each party is responsible for half of the special master fees, and it indicated that "[t]he Court may . . . change legal custody of the Children" if a party failed to pay his or her share of the fees.

¶15    In addressing child support, the court noted that "[t]here is no statutorily sanctioned method for hybrid joint/sole child support calculations." The court based its child support determination on the parties' imputed incomes, James having 110 overnights with LW and 182 overnights with the two youngest

that "even if the higher standard applied, based on the above findings," sufficient material and substantial changes had occurred to warrant a change in legal and physical custody of the children.

children, and Joanna having 255 overnights with LW and 183 overnights with the youngest children. The court adopted Joanna's proposed method of calculating child support, but it made adjustments given its imputation of a higher income to Joanna than she had proposed and given its award of equal parent-time for the youngest children. This resulted in James having a $1,607 monthly child support obligation.

¶16 The court also noted that James's $500 monthly child support obligation for EPW ended in April 2020, when EPW began living with him full-time. Accordingly, the court determined that James had overpaid child support by $6,000, which amount it credited against his future child support obligation. The court also ordered that neither party was obligated to pay child support for EPW—who had not yet turned 21—going forward.

¶17 Turning to Joanna's social media posts, the court clarified "that the non-disparagement provisions of the [stipulated divorce decree] extend to all social media platforms, email, and any other future mode of communication and/or information sharing technology or method as may arise." It further directed that "each party is restrained from posting about the other party, any spouse or significant other of the other party, or any relative of the other party on any social media platform of any kind." Lastly, the court declined to award either party attorney fees.

*Amended Modified Divorce Decree*

¶18 Joanna subsequently filed a motion to amend the modified divorce decree. Among other things, she sought amendment of the court's directives regarding summer parent-time, non-disparagement, child support, consequences for non-payment of the special master fees, and attorney fees. James opposed the motion, but neither party requested a hearing on the matter.

¶19   In August 2022, the court issued a written ruling on the motion. First, the court declined to amend the summer parent-time schedule. Joanna had argued that pursuant to Utah Code section 30-3-35.2,[8] the modified decree should incorporate two consecutive, uninterrupted weeks of parent-time during the summer. She had indicated that she normally visited family in Canada with the children during that two-week period. The court noted that the PGAL had recommended the week-on/week-off summer schedule, and the court held that the schedule was in the children's best interest. The court stated that "the parent-time schedule needs to be very clear with little or no flexibility" due to "the parties' refusal to cooperate with each other, their inflexibility regarding parent-time, their inability to communicate, their involvement of the Children in their disputes, and their struggles to comply with court orders." The court also noted that the current schedule did not prevent the children from visiting Canada and that "protecting the Children from conflict and lessening their overall stress and anxiety outweighs [Joanna's] desire to have two consecutive weeks because of the travel time to Canada."

¶20   The court also declined to amend its determination to credit James $6,000 for his overpayment of EPW's child support. It disagreed with Joanna's characterization that James "took" EPW from her in April 2020, much less that he did so "unlawfully" or "contemptuously." The court also pointed to the stipulated divorce decree, in which the parties specifically agreed to "augment child support in the amount of $500 per month" and

8. Our Legislature recently either repealed or renumbered all the provisions contained in Title 30, Chapter 3 of the Utah Code, which governed divorce. The statutes governing divorce are now located in Title 81, Chapter 4 of the Utah Code. But in this opinion, we cite the statutes in effect at the relevant time and not those currently in effect.

20220559-CA                    10                    2024 UT App 164

that "[c]hild support for EPW (including the augmented amount) shall continue until EPW reaches the age of 21." The court further noted that it ordered only reimbursement of the augmented amount—and not the base amount as well.

¶21 Nevertheless, the court did amend its child support award. It first reiterated, as it had in its prior ruling on the first motion to modify, that "[t]here is no statutorily sanctioned method for hybrid joint/sole custody child support calculations." The court then held that its prior adoption of Joanna's proposed method of calculating child support was inequitable because it did not properly account for the fact that LW was not having any overnights with James. The court also stated that Joanna's newly proposed child support calculation was also inequitable "because it uses the sole custody amount for [the youngest children] instead of the joint custody amount for them." Instead, the court determined that, based on the parties' imputed incomes, monthly child support for joint custody of three children was $465 per child and for sole custody of three children was $1,068 per child. The court thus ordered James to pay $465 per month for each of the two youngest children, and $1,068 per month for LW, totaling $1,998 per month. The court further directed that when LW's child support terminated upon her turning 18, James's child support obligation for the youngest children would be "based on the child support obligation worksheet for joint physical custody of two children."

¶22 Turning to attorney fees, the court noted that an award under Utah Code section 30-3-3 is discretionary and added that Joanna had not persuaded the court "that she had an actual need for attorney fees, especially given [her new husband's] active involvement in the case." Pointing to specific paragraphs, the court also indicated that its findings and conclusions were "replete with findings that support its decision to not award attorney fees to" Joanna or James. Accordingly, the court declined to amend its denial of attorney fees to Joanna.

¶23 The court next declined to remove its warning that a party's failure to pay the special master fees may result in a change in legal custody of the youngest children. The court indicated that it had ordered appointment of a special master due to the parties' inability to communicate appropriately or to reach shared decisions regarding the children and because the court feared one party would weaponize decision-making authority against the other. The court further noted that "the parties have a history of not paying the professionals who have been employed to assist their Children when they disagree with them" and that failure to timely pay the special master fees, resulting in the special master's withdrawal, would implicate several legal custody factors, "including the ability to give first priority to the welfare of the Children, co-parenting skills, maturity, willingness to protect the Children from conflict, and other relevant factors." Based on these considerations, the court held that the challenged provision was "appropriate and necessary in this case."

¶24 Lastly, the court addressed the non-disparagement provision. In her motion to amend, Joanna argued for the first time that the stipulated divorce decree's non-disparagement provision, particularly the court's determination that it extended to social media posts, infringed on her First Amendment right to free speech. She asserted that the "Court lacks constitutional authority to deny [her] right to free speech" because the directive that each party not disparage the other to third parties on social media "represents too extreme of a restriction." But the court ruled that "there is nothing in the United States Constitution or the Utah Constitution that prohibits the parties from voluntarily entering into non-disparagement provisions that limit the parties' right to free speech." And here, Joanna voluntarily agreed not to disparage James to third parties, and she did not specifically exempt social media posts from the "very broad non-disparagement provision." Accordingly, the court declined "to alter or amend" the stipulated divorce decree or the modified

divorce decree "in any way that would suggest that [Joanna] is no longer bound by the restraints that she voluntarily agreed to in the" stipulated decree. The court further held that its "clarification that such communication includes social media posts does not violate [Joanna's] right to free speech."

¶25 The court subsequently entered an amended modified divorce decree that incorporated these rulings. Joanna appeals.

ISSUES AND STANDARDS OF REVIEW

¶26 Joanna first argues that the non-disparagement provision, particularly the trial court's later clarification regarding social media posts, infringes on her First Amendment right to free speech. For the reasons discussed in Part I below, this issue is not preserved, and we therefore do not reach the merits of this argument. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation.").

¶27 Second, Joanna asserts that the court miscalculated James's monthly child support obligation. "We review the district court's decisions regarding child support . . . under the abuse of discretion standard." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (quotation simplified). Under this standard, "appellants bear a heavy burden, and we can properly find abuse only if no reasonable person would take the view adopted by the trial court." *Id.* (quotation simplified).

¶28 Third, Joanna challenges the court's determination that it was in the two youngest children's best interest to deviate from the statutory guidelines and to set their summer parent-time on a week-on/week-off basis. "We generally will not disturb the

district court's parent-time determination absent a showing that the court has abused its discretion." *Lay v. Lay*, 2018 UT App 137, ¶ 4, 427 P.3d 1221.

¶29   Lastly, Joanna argues that the court erred in declining to award her attorney fees under Utah Code section 30-3-3. "We review a district court's decision to award attorney fees pursuant to this statute for an abuse of discretion."[9] *Gardner v. Gardner,* 2019 UT 61, ¶ 16, 452 P.3d 1134.

---

9. Joanna also argues that the warning in the modified divorce decree and the amended modified divorce decree that failure to pay the special master fees may result in changes to legal custody of the youngest children was improper. But this argument is not ripe for review.

"[I]ssues are ripe for adjudication only where the legal determination can be applied to the facts of a particular controversy[.]" *Salt Lake County v. State*, 2020 UT 27, ¶ 20, 466 P.3d 158. Thus, an issue is not ripe "if there exists no more than a difference of opinion regarding the hypothetical application of a provision to a situation in which the parties might, at some future time, find themselves." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 40, 238 P.3d 1054 (quotation simplified). Here, the modified divorce decree provided, with our emphasis, that "[t]he Court *may . . .* change legal custody of the Children" if a party failed to pay his or her half of the special master fees. And in declining to amend that provision, the court reasoned that failure to pay the fees was relevant to several legal custody factors. As such, if either party failed to pay, resulting in withdrawal of the special master who currently has final decision-making authority for the two youngest children, the court would necessarily have to revisit legal custody—particularly if it decided against the appointment of a third special master. In such a situation, the court would need

(continued…)

ANALYSIS

I. The Non-Disparagement Provision

¶30 The modified divorce decree and the amended modified divorce decree both included sections clarifying that the non-disparagement provision that the parties agreed to in the stipulated divorce decree, which expressly included "all communication . . . to third parties," "extend[ed] to all social media platforms." Joanna contends that the non-disparagement provision—particularly the later clarification pertaining to social media posts—violates her First Amendment right to free speech because she "has the right to express her opinions, particularly if they do not rise to defamation." She further argues that although free speech rights may be waived, the waiver "requires clear and compelling evidence, as well as proof that it was voluntary, knowing, and intelligent." *See Levy ex rel. B.L. v. Mahanoy Area School Dist.*, 964 F.3d 170, 192 (3d Cir. 2020) ("All rights, including free speech rights, can be waived. But waivers must be voluntary, knowing, intelligent, and established by clear and compelling evidence.") (quotation simplified). And she asserts that in this case, "[t]hat evidence simply does not exist." But Joanna's argument is unpreserved.

¶31 "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "To provide the court with this

---

to assess the legal custody factors, possibly taking the failure to pay into account. But all of this is entirely speculative, depending on various future facts that are impossible to anticipate. For these reasons, the "conflict over the application of [the] provision has [not] sharpened into an actual or imminent clash of legal rights and obligations between the parties," and this issue is therefore not ripe for adjudication. *Id.* (quotation simplified).

opportunity, the issue must be specifically raised by the party asserting error, *in a timely manner*, and must be supported by evidence and relevant legal authority." *Id.* (emphasis added; quotation simplified). Absent a valid exception to our preservation rule, appellate courts will not reach the merits of an unpreserved issue, *id.*, even if the issue implicates a constitutional right, *Donjuan v. McDermott*, 2011 UT 72, ¶ 21, 266 P.3d 839.

¶32 Joanna raised her First Amendment claim for the first time in her motion to amend the modified divorce decree—after the trial in the matter had concluded and after the trial court had entered the modified divorce decree. She also did not request a hearing on her motion. If she had timely raised the free speech claim at trial, the parties could have presented evidence, and the trial court could have entered findings regarding the waiver issue. It is for this reason that "issues that are not raised at trial are usually deemed waived." *Sandusky v. Sandusky*, 2018 UT App 34, ¶ 37, 417 P.3d 634 (quotation simplified). Although there was no opportunity to present evidence on waiver due to her failure to timely raise the issue before the trial court, Joanna now seeks reversal on the ground that no clear and compelling evidence exists that she knowingly, voluntarily, and intelligently waived her free speech rights.

¶33 Moreover, the specific social media aspect of the non-disparagement provision was one that Joanna certainly could have raised at trial. Over a year prior to trial and entry of the modified divorce decree, the trial court ruled on James's motion to enforce related to Joanna's social media posts. In the ruling, the court held that Joanna's challenged social media posts were "publicly made" and that based on the non-disparagement provision's broad language, "it is proper to interpret social media postings as postings made to third parties." In light of this adverse ruling, Joanna could have readily raised that issue at trial, or even earlier.

¶34   Because Joanna did not raise her First Amendment challenge to the non-disparagement provision in a timely fashion, the issue is not preserved for appeal, and we do not address it on the merits. *Johnson*, 2017 UT 76, ¶ 15.

## II. Child Support

¶35   Joanna contends that the trial court erred in calculating James's child support obligation. Although she acknowledges that "this is not your standard child support calculation because of the difference in custody held by the parties with regard to differing children," she asserts that because the computation for having sole physical custody of LW alone based on the parties' imputed incomes is $1,810 per month, James's obligation for three children "cannot be *less than* his obligation would be for the one over which [she] has sole custody."[10] She next suggests an alternate method that the court should have used in calculating child support, which would have resulted in a monthly obligation of $2,136.72.

¶36   As an initial matter, in response to Joanna's motion to amend, the trial court increased James's child support obligation from $1,607 to $1,998 per month. His obligation is therefore not lower than what his obligation would be for LW alone. Additionally, the $1,810 figure used by Joanna does not appear to account for the existence of the two youngest children. The trial court determined that based on the parties' imputed incomes, the monthly child support obligation for sole custody of three

---

10. Joanna also challenges the trial court's calculations contained in its findings and conclusions and reflected in the modified divorce decree. But the amended modified divorce decree provided for an amended child support award which, as discussed below, the court imposed upon using a different calculation method that Joanna does not address in briefing. *See infra* ¶ 36.

children is actually $1,068 per child. Joanna's argument does not address this figure, much less why LW should be treated as an only child for child support purposes. The court next determined that the child support obligation for equal parent-time of three children is $465 per child—which figure Joanna likewise has not addressed. The court thus ordered James to pay $1,068 per month for LW, and $465 per month for each of the two youngest children, resulting in a total child support obligation of $1,998 per month.

¶37 This method of addressing the atypical custody situation presented in this case is not unreasonable. The trial court clearly showed its work in reaching the $1,998 figure, and we cannot say that Joanna has met her "heavy burden" of showing that no reasonable person would adopt the trial court's approach in calculating child support. *See Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (quotation simplified). We therefore affirm the court's child support award.

¶38 Joanna also argues that the trial court erred in ordering that James be credited $6,000 toward his future support payments, representing the amount he overpaid in child support for EPW after EPW began living with him full-time in April 2020. She asserts that EPW "had been erroneously removed from [her] home" and that "[t]he correct date for ending the $500 additional support for EPW would have more appropriately been the date he reached the age of majority"—not when he turns 21—resulting in an overpayment amount of only $1,500. But Joanna does not address the court's finding that following the second incident with EPW in which she called the police, she "conveyed to [EPW] that he could not live with her." And although the court also found that neither party behaved commendably in the events surrounding EPW's move, the court expressly rejected Joanna's contention that James "took" EPW away from her.

¶39 Joanna likewise does not address the parties' agreement in the stipulated divorce decree that, due to EPW's special needs,

"[c]hild support for EPW (including the augmented amount [of $500]) shall continue until EPW achieves the age of 21." Joanna also does not deny that since April 2020, James paid her $6,000 in child support attributable to EPW. Accordingly, even assuming that the child support should have more appropriately ended when EPW turned 18, this does not change the fact that James overpaid child support. To the contrary, this would only bolster the conclusion that James overpaid child support, and Joanna has not argued why she should be entitled to the windfall. Also of note, the court ordered that James be reimbursed only the additional augmented amount of $500 per month—and not also the base child support amount attributable to EPW that he paid. Nor did the court order that Joanna pay James child support for the time EPW lived full-time with him—it merely ordered that James be reimbursed the amount of the augmented child support that he paid Joanna for the time that EPW resided with him.

¶40 Because Joanna has not provided persuasive argument on why she should be allowed to keep the augmented child support for EPW from the time when he no longer resided with her, we likewise affirm the trial court's order that James be credited $6,000.[11]

_____

11. Joanna's citations to two cases in support of her position are unpersuasive. First, she cites *Allen v. Allen*, 2021 UT App 20, 483 P.3d 730, *cert. denied*, 496 P.3d 714 (Utah 2021), in support of her assertion that Utah "appellate courts have declined to address claims of overpayment during a time where a final order has not yet been entered altering the child support payment." But here there was, in fact, a final order: the modified divorce decree, and later the amended modified divorce decree. Furthermore, *Allen* is distinguishable. In that case, this court declined to address the appellant's argument because he failed to address the trial court's rationale for declining to give him "credit" for the child support

(continued…)

### III. Summer Parent-Time

¶41    Joanna argues that the trial court erred in setting summer parent-time for the two youngest children on a week-on/week-off schedule. She asserts that this schedule fails to allow for the consecutive two-week period of parent-time provided for by Utah Code section 30-3-35.2(5)(a), which was in effect at the relevant time and addressed equal parent-time schedules, and stated that "[e]ach year, a parent may designate two consecutive weeks to exercise uninterrupted parent-time during the summer when school is not in session."

¶42    But the trial court was not required to strictly comply with section 30-3-35.2(5)(a). Utah Code section 30-3-34(1) directed that "[i]f the parties are unable to agree on a parent-time schedule, the court may . . . establish a parent-time schedule" *or* "order a parent-time schedule described in," among others, section 30-3-35.2.[12] Accordingly, "district courts are generally afforded broad discretion to establish parent-time," *Lay v. Lay*, 2018 UT

_____

payments he made prior to entry of temporary orders. *See id.* ¶ 35. It was not a resolution on the merits.

    She next cites *Silcox v. Silcox*, 2002 UT App 416U, in support of her contention that "where overpayments were faulted to both parties to some degree, the appellate courts have affirmed no award of overpayments." But here, the trial court did not make any findings regarding fault, so *Silcox* is inapplicable.

12. Utah Code section 30-3-35 set "a default minimum parent-time schedule to which the noncustodial parent and the child who is between five and eighteen years old shall be entitled, unless the court determine[d] that Section 30-3-35.1 should apply or a parent [could] establish that more or less parent-time should be awarded." *Lay v. Lay*, 2018 UT App 137, ¶ 6, 427 P.3d 1221 (quotation simplified). This is not at issue here, where the trial court awarded equal parent-time for the youngest children.

App 137, ¶ 16, 427 P.3d 1221 (quotation simplified), that is in the best interest of the children, Utah Code Ann. § 30-3-34(5) (LexisNexis 2022); *Tober v. Tobler*, 2014 UT App 239, ¶ 24, 337 P.3d 296. The trial court was thus not required to strictly follow section 30-3-35.2(5)(a)'s guidelines so long as the court concluded that it was in the children's best interest to do otherwise and the court provided sufficiently detailed findings supporting its conclusion. *See Nakkina v. Mahanthi*, 2021 UT App 111, ¶ 20, 496 P.3d 1173 (stating that the parent-time schedule "must be firmly anchored on findings of fact that (1) are sufficiently detailed, (2) include enough facts to disclose the process through which the ultimate conclusion is reached, (3) indicate the process is logical and properly supported, and (4) are not clearly erroneous") (quotation simplified).

¶43 Here, the trial court entered extensive findings regarding "the parties' refusal to cooperate with each other, their inflexibility regarding parent-time, their inability to communicate, their involvement of the Children in their disputes, and their struggles to comply with court orders." The court further found that these conflicts resulted in the children "experiencing stress, anxiety, and depression." Additionally, the PGAL, who recommended the week-on/week-off summer schedule to the court, expressed concern that the parties' high-conflict relationship would likely render it extremely difficult for them to select and agree on their two consecutive weeks each summer. Accordingly, the court determined that "the parent-time schedule needs to be very clear with little or no flexibility," and it adopted the PGAL's recommended summer schedule. Later, in response to Joanna's motion to amend, the court also found that "protecting the Children from conflict and lessening their overall stress and anxiety outweighs [Joanna's] desire to have two consecutive weeks because of the travel time to Canada."

¶44    Joanna does not engage with the trial court's findings or reasoning for setting the week-on/week-off summer schedule. Instead, she asserts that not allowing for two weeks of uninterrupted parent-time in the summer is against the children's best interest because it denies them the opportunity to spend time with their extended family in Canada. But Joanna does not address the court's determination that the current summer schedule would not, in fact, prevent the children from visiting Canada—albeit on a shorter basis. She also has not addressed how visiting Canada for two weeks—as opposed to one week— outweighs the children's interest in avoiding additional conflict between their parents. Absent discussion of any inadequacies in the court's findings and reasoning behind the summer schedule, *see id.*, Joanna's argument is insufficient to show that the summer schedule constitutes an abuse of discretion.

## IV. Attorney Fees

¶45    Utah Code section 30-3-3(1),[13] which was in effect at the relevant time, provided that

> in any action to establish an order of custody,
> parent-time, child support, alimony, or division of
> property in a domestic case, the court may order a
> party to pay the costs, attorney fees, and witness

---

13. Joanna's appellate argument generally references Utah Code section 30-3-3, which has since been renumbered as Utah Code section 81-1-203, without specifying the subsection on which she based her attorney fee request. *See generally Tilleman v. Tilleman*, 2024 UT App 54, ¶¶ 74–76, 549 P.3d 65 (discussing the different standards for attorney-fee requests made under subsection 30-3-3(1) and subsection 30-3-3(2)), *cert. denied*, Sept. 12, 2024 (No. 20240842). But her focus on the receiving spouse's needs, the other spouse's ability to pay, and the reasonableness of the fees indicate that her argument implicates section 30-3-3(1). *See id.* ¶ 74.

fees, including expert witness fees, of the other party to enable the other party to prosecute or defend the action.

"[T]he party to be awarded attorney fees under this [subsection] has the burden to prove (1) that the payee spouse has a financial need, (2) that the payor spouse has the ability to pay, and (3) that the fees requested are reasonable." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 44, 540 P.3d 727. The decision whether to award attorney fees under this subsection is discretionary with the trial court. *Id.* But "[s]hould the trial court decide to award fees, it must make detailed findings of fact supporting its determination," specifically concerning the payee spouse's financial need, the payor spouse's ability to pay, and the reasonableness of the requested fees. *Connell v. Connell*, 2010 UT App 139, ¶ 27, 233 P.3d 836.

¶46   Here, in declining to award attorney fees under section 30-3-3, the trial court emphasized that the decision to award attorney fees under that statute is discretionary. The court then stated that Joanna had not persuaded it "that she had an actual need for attorney fees, especially given [her new husband's] active involvement in the case." The court further added that its findings of fact and conclusions of law "are replete with findings that support its decision to not award attorney fees to" Joanna or James, and it then referenced several paragraphs in the findings and conclusions by number.

¶47   Joanna argues that the court erred in denying her request for attorney fees because the evidence presented at trial was sufficient to meet subsection 30-3-3(1)'s criteria. But, as discussed above, regardless of whether the criteria are satisfied, section 30-3-3(1) stated, with our emphasis, that "the court *may* order a party to pay . . . attorney fees"—it did not mandate that attorney fees be awarded. *See Lobendahn*, 2023 UT App 137, ¶ 44. And Joanna has not argued how the court's decision not to award

her attorney fees was an abuse of discretion, i.e., a decision that no reasonable person would make. *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 ("Appellants bear a heavy burden, and we can properly find abuse only if no reasonable person would take the view adopted by the trial court.") (quotation simplified).

¶48   Joanna also contends that "[t]here is no authority that indicates that a party's spouse should not be afforded fees under the needs-based analysis." She also indicates that she at one point had to hire outside counsel due to the allegations of abuse James made in his application for the temporary stalking injunction, regarding which her new husband was a necessary witness. But the court did not rule that she was not entitled to fees solely on the basis that her husband represented her. Instead, the court expressly considered her new husband's representation in the context of addressing her need for the attorney fees. It was not unreasonable for the court to consider whether she actually incurred an obligation to pay attorney fees in addressing that prong. Additionally, Joanna does not address the several findings the court pointed to in support of its decision to deny her attorney fees that were independent of the fact that her husband acted as her attorney.

¶49   For these reasons, the trial court did not abuse its discretion when it denied Joanna's request for attorney fees.[14]

---

14. James also seeks an award of attorney fees incurred on appeal. "Generally, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Fadel v. Deseret First Credit Union*, 2017 UT App 165, ¶ 38, 405 P.3d 807 (quotation simplified), *cert. denied*, 409 P.3d 1047 (Utah 2017). But because James was not awarded attorney fees below, we deny his request.

## CONCLUSION

¶50 We do not reach the merits of Joanna's challenges to the non-disparagement provision or to the provision warning that failure to pay the special master fees may result in a change of legal custody—the former because her argument was not preserved and the latter because it is not ripe for review. We reject Joanna's remaining challenges to the amended modified divorce decree on the merits.[15]

¶51 Affirmed.

─────────

---

15. In her reply brief, Joanna asserts that James's appellate brief violated rule 24 of the Utah Rules of Appellate Procedure and accordingly requests that his brief be stricken and that she be awarded attorney fees incurred on appeal. We decline to impose these sanctions.