**2025 UT App 136**

## THE UTAH COURT OF APPEALS

JAMES M. DUFFIN III,
Appellant,
*v.*
BRANDY E. DUFFIN,
Appellee.

Opinion
No. 20230808-CA
Filed September 5, 2025

Third District Court, West Jordan Department
The Honorable Matthew Bates
No. 184400962

Julie J. Nelson, Attorney for Appellant

T. Jake Hinkins, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      James M. Duffin III and Brandy E. Duffin divorced in April 2020 and were awarded joint legal custody of their two children. Brandy[1] was designated the primary physical custodian, and James was awarded alternative statutory minimum parent-time. Shortly after the divorce was finalized, James filed a petition to modify parent-time and the right of first refusal, which the court denied. James now appeals that denial. For the reasons set forth below, we affirm.

---

1. Because the parties share the same last name, we refer to them by their given names.

BACKGROUND

¶2   James and Brandy were married in 2015 and are the parents of two minor children (the Children). The eldest child (Son) has been diagnosed with autism spectrum disorder and has special needs. In 2018, James filed for a divorce. He requested that the court award him equal parent-time in accordance with Utah Code section 81-9-305.[2] The matter proceeded to a bench trial in March 2020.

¶3   The district court awarded the parties joint legal custody of the Children, with Brandy designated as the primary physical custodian. The court ordered the parties to "discuss and try to reach agreement on questions of education, medical decisions, religion, and other joint legal custody issues." However, in the event that the parties could not reach an agreement on a particular issue, the court determined that Brandy would "have final say in the matter."

¶4   While the district court did not grant James's request for equal parent-time, it did award him more parent-time than the statutory minimum schedule. Specifically, the court ordered that James have five overnights with the Children in each two-week period, pursuant to Utah Code section 81-9-303. The court emphasized that this ruling was "not meant in any way to diminish the role of either party as a parent or to disrespect the importance of either party as a parent, but [was] simply a practical recognition that ping ponging the [C]hildren back and forth 50

---

2. The statutory provisions of Title 30 of the Utah Code that were in effect at the time of the district court proceedings have since been renumbered and recodified as part of the Utah Domestic Relations Code, which is now found in Title 81 of the Utah Code. Because the provisions relevant to our analysis have not been substantively amended, we cite the recodified version for convenience.

percent of the time [was] not in the best interest of [the Children]." The court also determined that there would be "a right of first refusal only on overnights," reasoning that "during the daytime, particularly in a case like this, having any other right of first refusal is unproductive." The parties were also ordered to "equally share the reasonable work-related childcare expenses."

¶5     In making the custody and parent-time awards, the district court considered relevant statutory and case law custody factors. The court found that many of the factors did not weigh in favor of either party and that James and Brandy were both involved parents and had good relationships with their children. But the court also found that certain factors weighed in favor of Brandy being the custodial parent and of James having something less than equal parent-time but more than the statutory minimum. In particular, the court found that while both of the Children would benefit from a schedule that would not require them to "ping pong . . . back and forth between homes," having a schedule where the Children are "getting up most of the time in the same home when they're going to school" and having "the same routine as much as possible" was particularly important given Son's autism diagnosis. The court also found that while James had been "supportive of" Son's therapy, Brandy had been more involved and had been primarily responsible for arranging much of the therapy. Moreover, James's lack of "geographic proximity" to the Children weighed against equal parent-time given that James lived forty minutes away by car, which required "a lot of driving time" for each transition.

¶6     In September 2020, James filed a petition to modify based on several changed circumstances. As relevant here, he argued that a modification was warranted because, since the entry of the divorce decree, he had moved less than four miles from Brandy's residence and closer to the Children's school. He again requested that the court award him equal parent-time.

¶7 In June 2021, James moved to amend his petition to modify to address the right of first refusal. James alleged that Brandy had obtained full-time employment and had "enrolled the [Children] in full-time daycare" without informing him of her intent to do so. He further alleged that because of this change, Brandy was no longer available to help Son with his therapy, and the therapy was now being facilitated by the daycare provider. Given that James was "available during the day to provide actual care for the [Children] and . . . to help [Son] with his . . . therapy," James requested that the court modify the decree so that each party would "have first right of refusal to care for the [C]hildren when the other parent is unable to be with the [C]hildren for more than four (4) hours."

¶8 Shortly thereafter, James filed a motion to enforce. In support of that motion, James averred that Brandy had failed to follow the decree as far as "discuss[ing] joint legal custody issues" because she had enrolled the Children in daycare without discussing it with him. He asked that the court find her in contempt "for her failure to involve [him] in joint legal custody decisions regarding the [Children]."

¶9 The district court held a two-day bench trial on James's amended petition to modify in May 2023. The court entered its findings of fact, conclusions of law, and final order in August 2023. The court found that, since the entry of the decree, James had relocated to be closer to the Children, and the communication between the parties had become less "hostil[e] and antagonis[tic]" and more "courteous and polite." The court found that these things, taken together, constituted a material change in circumstance that warranted revisiting custody and parent-time.

¶10 The district court then made several findings concerning the change in circumstance. First, the court found that the Children were "thriving" under the current arrangement. The court recognized that although the younger child had been having

tantrums, Brandy had been taking him to therapy and he had been responding well to it. The court found that James and Brandy were both "actively involved in parenting" the Children, which included attending school conferences and Son's therapy.

¶11    Second, the district court found that although the communication between the parties had improved, it was "still not great." In particular, the court found that James was "often slow to respond to questions from Brandy and in some cases he never respond[ed]," which made the court "concerned" about "the parties' ability to effectively make decisions together."

¶12    Third, the district court addressed Brandy's final say authority and her decision to enroll the Children in daycare. The court found that Brandy did not abuse her final say by enrolling the Children in daycare "because the parties only have an overnight right of first refusal." The court explained,

> The parties are free to use their individual discretion to find surrogate care providers during their parent-time. Brandy's decision to enroll the [C]hildren in daycare was a reasonable exercise of her parental authority over the [C]hildren during her parent-time. And it really is no different than [James] arranging for his mother or another family member to watch the [C]hildren during his parent-time.
>
> . . . [T]he Court finds that surrogate care during a parent's *parent-time is not a legal custody issue in this case*, but is a day-to-day child management issue.

(Emphasis added.)

¶13    Lastly, the district court determined that "all other findings made by the Court in support of its initial child custody and parent-time decision in 2020 remain the same."

¶14    Having addressed the change in circumstance, the district court then examined whether a modification of the current custody and parent-time schedule would be in the Children's best interest. Ultimately, the court determined that the Children's best interest would be best served by "maintain[ing] the status quo."

¶15    The district court found that the "biggest factor" weighing against a modification was that the Children were "thriving" under the current schedule and there was "no reason to amend a custody and parent-time schedule where the [C]hildren [were] otherwise thriving." The court again noted the issue of the younger child's tantrums; however, the court found there was "no evidence" that changing parent-time or custody would help the tantrums. The court also found there was "no evidence that a parent-time change [was] needed to correct any other problem or issue with the [C]hildren."

¶16    Next, the district court addressed the parties' communication and the decision-making framework. The court stated that it was "concerned about the parties' ability to co-parent on a 50/50 schedule." The court explained, "50/50 is for parents who co-parent well. It requires mutual respect, flexibility, and frequent communication—and the parties do not yet have that." And the court declined to change the parties' decision-making framework. Regarding the final say, the court found that the arrangement with Brandy having the final say "seem[ed] to be working well." Moreover, given James's "slowness or failures to communicate" with Brandy, the court was "particularly averse to changing the right of first refusal" because it did "not want to create a situation where the parents might have to communicate regularly about whether one of them is going to have the [Children] on the other's parent-time while the other works." In the court's view, such an arrangement would make it "difficult for Brandy to arrange daycare" and "it would not be healthy for the [C]hildren to have constant uncertainty about where they would be before and after school." The court also rejected James's

suggestion that he be allowed to declare his intent to watch the Children weeks in advance, finding it "unworkable given the poor communication that the parties have right now, particularly [James's] poor communication."

¶17    Finally, having determined that the decision to enroll the Children in daycare "was a proper exercise of [Brandy's] physical custody of the [C]hildren when she had them," the district court denied James's motion to enforce and found that Brandy was not in contempt.

ISSUES AND STANDARDS OF REVIEW

¶18    James now appeals, raising two issues for our review. First, he argues that the district court employed the wrong legal standard when considering his request for equal parent-time because it determined that "frequent communication" is a prerequisite to equal parent-time. "We review custody determinations under an abuse of discretion standard, giving the district court broad discretion to make custody awards." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 18, 540 P.3d 727 (quotation simplified). But "whether the trial court employed the proper standards presents a legal question which is reviewed for correctness." *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 46, 516 P.3d 306 (quotation simplified).

¶19    Second, James argues that the district court erred in determining that the decision to send the Children to daycare was not a legal custody decision and, as a consequence, erred in refusing to hold Brandy in contempt, in denying a daytime right of first refusal, and in requiring James to pay for half of the daycare costs. "[W]e review the district court's interpretation of a statute for correctness." *Lay v. Lay*, 2018 UT App 137, ¶ 4, 427 P.3d 1221. We otherwise review the court's custody determinations for

an abuse of discretion and the underlying factual findings for clear error. *Lobendahn*, 2023 UT App 137, ¶ 18.[3]

ANALYSIS

## I. Parent-Time

¶20     James argues that the district court applied the wrong legal standard when considering his request for equal parent-time. More specifically, he contends that the court erroneously "treat[ed] frequent communication as a prerequisite to equal parent-time." We disagree with this characterization of the court's ruling.

¶21     To modify a custody order, the district court must engage in a two-part test. First, the court must find that "a substantial and material change of circumstance has occurred." Utah Code § 81-9-208(4)(b)(i). Once the court finds such a changed circumstance, it must then find that "a modification . . . would be an improvement for and in the best interest of the minor child." *Id.* § 81-9-208(4)(b)(ii). In making the latter determination, "the court shall, in addition to other factors the court considers relevant, consider the factors described in Sections 81-9-204 and 81-9-205," *id.* § 81-9-208(4)(a), and, as relevant here, section 81-9-305. "The court shall give substantial weight to the existing joint legal custody or joint physical custody order when the minor child is thriving, happy, and well-adjusted." *Id.* § 81-9-208(4)(c).

¶22     While all the custody factors are important, "each is not on equal footing." *Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. "The district court generally has discretion to determine,

---

3. James raised an additional issue in his opening brief; however, prior to oral argument he filed a suggestion of mootness notifying us that the issue is now moot. We therefore do not address the issue.

based on the facts before it and within the confines set by the appellate courts, where a particular factor falls within the spectrum of relative importance and to accord each factor its appropriate weight." *Twitchell v. Twitchell*, 2022 UT App 49, ¶ 20, 509 P.3d 806 (quotation simplified). Nevertheless, a court commits legal error where it fails to accord the appropriate level of weight to a critical factor or where it relies too heavily on a less critical factor. *See Cummings v. Cummings*, 821 P.2d 472, 478–80 (Utah Ct. App. 1991) (reversing a custody modification where the district court failed to give proper consideration or weight to the prior custody arrangement and relied too heavily on the child's preference).

¶23 Here, the district court found that James's relocation closer to Brandy and the "decrease in the hostility and antagonism between the parties in their communication" constituted a change in circumstance sufficient to warrant the reconsideration of parent-time. However, after considering the changed circumstance and "the facts found at trial," the court determined that it was in the Children's best interest "to maintain the status quo." In support of this decision, the court considered, among other things, the parties' ability to co-parent and communicate, finding as follows: "The Court is . . . concerned about the parties' ability to co-parent on a 50/50 schedule. 50/50 is for parents who co-parent well. It *requires* mutual respect, flexibility, and *frequent communication*—and the parties do not yet have that." (Emphasis added.) James attempts to frame the court's decision to not modify parent-time as legal error by arguing that the above emphasized phrases indicate that the court treated "frequent communication" as a prerequisite to ordering equal parent-time. This attempt is unavailing, however, because James's selective focus misreads the court's determination.

¶24 In addition to expressly incorporating all findings "in support of its initial child custody and parent-time decision," the district court made several new findings in support of its decision

to "maintain the status quo." These findings focused on multiple things, only one of which was the parties' ability to co-parent and communicate. Critically, the court found that the "biggest factor" weighing against a modification was the fact that the Children were "thriving" under the current schedule, and the court saw "no reason to amend a custody and parent-time schedule where the [C]hildren [were] otherwise thriving." The court also found no evidence of any issue with the Children that needed to be corrected by changing parent-time.

¶25 While the district court clearly considered communication an important factor in this case, we do not agree with James that the court viewed "frequent communication" as a prerequisite to equal parent-time. The court elected to revisit parent-time based partly on an improvement in the tone of the parties' communication. But after examining the improved communication along with the other facts found at trial, the court determined that the communication had not improved to the degree that a modification "would be an improvement for and in the best interest" of the Children. Utah Code § 81-9-208(4)(b)(ii). The statement with which James takes issue is merely the precursor to the court detailing why the parties' current communication did not suggest that equal parent-time would be in the best interest of the Children. That is, the court found the communication between the parties was "poor" and that James in particular had demonstrated "slowness or failures to communicate." Thus, the court's reference to "frequent communication" must be read in the context of what the court considered as important to the Children's best interest. And as James himself recognizes, the court was allowed to consider the parties' "co-parenting skills," including the "ability to appropriately communicate with the other parent." *Id.* §§ 81-9-204(4)(c)(ii), -205(5)(c).

¶26 Additionally, James argues that the district court abused its discretion by declining his request for equal parent-time based on

an "incorrect understanding" that an equal parent-time arrangement requires more communication than the alternative minimum parent-time that the court originally ordered. *Compare id.* § 81-9-303(6) (alternative minimum parent-time schedule involves at least four parent-time exchanges over two weeks), *with id.* § 81-9-305(3)(a) (equal parent-time schedule involves four parent-time exchanges over two weeks). This argument is not persuasive because, as already discussed, the parties' communication was but one of the factors the court relied upon in making its decision. The court placed significant weight on the fact that the Children were "thriving" under the current parent-time schedule, mentioning this fact multiple times and explicitly stating that it was the "biggest factor" driving its decision to maintain the current schedule. *See id.* § 81-9-208(4)(c) ("The court shall give substantial weight to the existing joint legal custody or joint physical custody order when the minor child is thriving, happy, and well-adjusted."); *accord Lobendahn*, 2023 UT App 137, ¶ 39. It is therefore inaccurate to say that the court denied James's request based solely on the understanding that the parties' current arrangement required less communication than the equal parent-time James sought.

¶27   For all these reasons, the district court did not err or abuse its discretion in denying James's petition to modify parent-time.

## II. Daycare

¶28   The second issue raised by James concerns the district court's rulings related to daycare for the Children during Brandy's parent-time. James takes issue with both the court's determination that Brandy enrolling the Children in daycare was not a joint legal custody issue and the court's refusal to modify the right of first refusal to include a daytime right. He also contends that the court abused its discretion by requiring him to pay for half of the cost of daycare. We address each argument in turn.

A.     Legal Custody

¶29     The district court rejected James's contention that Brandy's decision to send the Children to daycare during her parent-time was a legal custody decision. The court found that "surrogate care during a parent's parent-time is not a legal custody issue in this case, but is a day-to-day child management issue." And consistent with this determination, the court concluded that the parties were "free to use their individual discretion to find surrogate care providers during their parent-time." James argues that the court erred by classifying the daycare decision as a physical custody decision. He asserts that in this case, where parental care from the other parent is available and daycare functions both as school and medical care for Son, the decision is a legal one. We disagree.

¶30     Generally, the distinction between legal and physical custody turns on the type of decision at issue. "Legal custody encompasses the ability to make *major decisions* in a child's life, while physical custody encompasses the ability to make *day-to-day decisions* in a child's life." *Blake v. Smith*, 2023 UT App 78, ¶ 15, 534 P.3d 761 (emphasis added); *see also Custody*, Black's Law Dictionary (12th ed. 2024) (defining "legal custody" as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare"). As provided in Utah law and as the primary physical custodian, Brandy was entitled to control the Children's "daily activities" during her parent-time. *Hansen v. Hansen*, 2012 UT 9, ¶ 17, 270 P.3d 531; *see also* Utah Code § 81-9-203(12) ("Each parent may make decisions regarding the day-to-day care and control of the minor child while the minor child is residing with that parent."). That James was sometimes available to provide parental care while Brandy was at work does not transform the nature of the underlying decision from a day-to-day decision to a major decision. Here, regardless of who is caring for the Children during the day, the decision is one that implicates Brandy's day-to-day life with the Children during her parent-time.

¶31    James's attempt to couch the daycare decision as a legal decision based on the notion that he is available to provide parental care is not persuasive. At the time James filed his petition to modify, he was unemployed and "available during the day" to care for the Children. By the time of trial, however, James had obtained full-time employment. Nevertheless, James testified that "routine daycare" was "not necessary" because he had "the flexibility" to provide parental care, and if he was not available to do so, he had "reliable people"—including his mother and neighbors—who could step in and help. But James has made no attempt to square his initial argument with the reality that he is now unable to provide the Children parental care for the entirety of the time Brandy is at work and must rely at least partially on surrogate care of his own choosing. We therefore agree with the district court that "Brandy's decision to enroll the [C]hildren in daycare . . . . really is no different than [James] arranging for his mother or another family member to watch the [C]hildren during his parent-time."[4]

¶32    And the evidence presented at trial belies the notion that Brandy's decision to send the Children to daycare constituted an educational or medical decision. Indeed, there was no evidence presented at trial demonstrating that the daycare in this case functions as the Children's school. On appeal, James's attempt to equate daycare to school is seemingly based upon the fact that the decree "treats daycare the way other decrees often treat school—

---

4. In his reply brief, James attempts to argue that his decision to enlist free surrogate care is different from Brandy's decision to pay for surrogate care because one of the Utah Code's advisory guidelines provides that "child care arrangements with nominal or no charge" "are preferred." Utah Code § 81-9-202(13)(c). While this may be true, it does not follow that a suggested preference in an advisory guideline establishes that the decision to use paid versus free surrogate care is fundamentally different; all it establishes is that a specific arrangement is preferred.

as the exchange place." But this has nothing to do with whether the Children are being educated while at daycare.[5] Similarly, there was no evidence presented that this daycare is a specialized daycare that provides medical treatment for Son's autism. Although Son participated in therapy while at the daycare facility, at oral argument before this court, Brandy's attorney explained that Son's therapist was not affiliated with the daycare. Rather, the therapist would travel to wherever Son was located—either the home or the daycare—and provide the therapy. James did not take issue with Brandy's explanation of how the therapy was being applied.[6]

---

5. We do not discount the notion that learning is inherent in early childhood settings and that in many situations, the selection of a daycare for a young child and that of a pre-school program may involve similar considerations. But our domestic relations statutes do not define "education" or "daycare" and, if anything, suggest a distinction between the "parenting functions" of "attending to the daily needs of the minor child, such as feeding, clothing, physical care, grooming, supervision, health care, day care, and engaging in other activities which are appropriate to the developmental level of the minor child" and "attending to adequate education for the minor child." Utah Code § 81-9-101(7).

6. Additionally, James has wholly ignored that the district court specifically addressed therapy in the decree, ruling as follows:

> Each party will set the therapy for the minor child, which that party will attend at a time when that party has parent-time with the minor child. The therapy schedule will not infringe on the other party's parent-time and the parties will be allowed to pick up the [C]hildren with enough time to attend scheduled therapy appointments during that party's parent-time.

(continued…)

¶33 Based on the foregoing, the district court did not err, on this record, in determining that Brandy's decision to send the Children to daycare was a physical custody decision and that, consequently, Brandy was not in contempt for failing to discuss that decision with James.

B.     Right of First Refusal

¶34 Next, James argues that even if the district court correctly determined that the decision to send the Children to daycare is a physical custody decision, the court nevertheless abused its discretion by denying his request to modify the overnight right of first refusal to include a daytime right "when the other parent is unable to be with the [C]hildren for more than four (4) hours." He contends that the court's decision was inequitable because, "even though James has much less parent-time than Brandy, the court elevated Brandy's desire to send the [C]hildren to daycare over the [C]hildren spending time with James" and "the court based its decision at least in part on communication between the parents." Once again, we disagree with James.

¶35 Utah Code section 81-9-202 contains "advisory guidelines" that are "suggested" to govern parent-time arrangements. Utah Code § 81-9-202(1). One such guideline states,

> (a) Parental care is presumed to be better care for the minor child than surrogate care.
>
> (b) The court shall encourage the parties to cooperate in allowing the noncustodial parent, if willing and able to transport the minor child, to provide the child care.

---

All the therapy appointments at issue occurred during Brandy's parent-time, and James did not include a request to alter this provision in his petition to modify.

> (c) Child care arrangements existing during the
> marriage are preferred as are child care
> arrangements with nominal or no charge.

*Id.* § 81-9-202(13). While this guideline "favors parental care, the statute's plain language does not entitle the willing and able noncustodial parent to provide day care. It merely suggests that the trial court encourage such an arrangement based on the presumption that parental care is better." *Wight v. Wight*, 2011 UT App 424, ¶ 22, 268 P.3d 861 (quotation simplified). The court retains discretion "to determine whether parental day care by the noncustodial parent is appropriate." *Childs v. Childs*, 967 P.2d 942, 946 (Utah Ct. App. 1998); *see also Vaughan v. Romander*, 2015 UT App 244, ¶ 25, 360 P.3d 761 ("Because [the mother] is not entitled to a right of first refusal, it would have been within the trial court's discretion to have declined to order any right of first refusal at all.").

¶36 Here, the district court explained its decision to deny James's request for a daytime right of first refusal as follows:

> The Court does not want to create a situation where the parents might have to communicate regularly about whether one of them is going to have the [Children] on the other's parent-time while the other works. It would be difficult for Brandy to arrange daycare if [James] had a right to take the [Children] while she worked anytime he pleases. And it would not be healthy for the [C]hildren to have constant uncertainty about where they would be before and after school.

The court also rejected James's suggestion that he be allowed to declare in advance his intent to care for the Children when Brandy was working, finding that such an arrangement would be "unworkable given the poor communication that the parties have right now, particularly [James's] poor communication."

¶37 We cannot say that the district court exceeded its considerable discretion in so ruling. While section 81-9-202 favors parental care, it certainly does not require it. The court thoughtfully articulated multiple reasons why a daytime right of first refusal would be inappropriate in this case. Although the parties' communication was one such issue, the court was also troubled with the practical difficulties of opening the door to a more expansive right of first refusal. Critically, the court was concerned that allowing James to take the Children anytime during the day would hamper Brandy's ability to schedule daycare and that it would also create an unhealthy environment for the Children because they would face "constant uncertainty about where they would be before and after school." Given all this, James's argument fails.

C.     Paying for Daycare

¶38 Lastly, James argues that if the decision to send the Children to daycare is truly a physical custody decision, and it is Brandy's decision, the district court abused its discretion by requiring him to pay half of the daycare costs. But James failed to preserve this claim for our review, and he does not assert that any exception to our preservation rule allows us to reach the merits of his argument.

¶39 In the decree, the district court ordered that "each parent shall equally share the reasonable work-related childcare expenses for the minor children." James did not ask the court to modify this provision in his petition to modify. As discussed above, the main modifications sought by James were an increase in parent-time and an expanded right of first refusal. Because these requests do not encompass a request to modify the provision controlling the division of childcare expenses set forth in the decree, the district court did not have an opportunity to rule on this issue, and therefore James cannot now ask us to modify

that provision on appeal. *See Ahhmigo, LLC v. Synergy Co. of Utah*, 2022 UT 4, ¶ 16, 506 P.3d 536.

CONCLUSION

¶40 The district court properly denied James's petition to modify parent-time and the right of first refusal, as well as his request that the court find Brandy in contempt. The court correctly applied the legal standards for evaluating parent-time, and it did not err in determining that the decision to send the Children to daycare in this case was a physical custody decision.[7]

¶41 Affirmed.

––––––––––

7. Brandy also requests an award of attorney fees incurred on appeal. "Ordinarily, when fees in a divorce have been awarded below to the party who then prevails on appeal, fees will also be awarded to that party on appeal." *Crouse v. Crouse*, 817 P.2d 836, 840 (Utah Ct. App. 1991) (quotation simplified). But because the district court declined to award Brandy attorney fees below, we deny her request.